The Commonwealth of Puerto Rico, etc., Plaintiff and Appellee, v. José Luis Pérez and his wife Evangelina López Rodríguez, Defendants and Appellants.

No. R-68-238.    Decided March 10, 1970.

766

*Clemente Pérez Martínez* for appellants. *Rafael A. Rivera Cruz, Solicitor General, J. F. Rodríguez Rivera, Acting Solicitor General, Peter Ortiz, Acting Solicitor General,* and *Dolores Ruiz Zambrana, Assistant Solicitor General,* for appellee. *Lino J. Saldaña,* Amicus Curiae.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On September 30, 1965 the Commonwealth filed a condemnation action and obtained title to a parcel of land having an area of 5,914.57 sq. m. according to survey (6,126.78 sq. m. according to the Registry), situated in Martín Peña, bounded on the north by the Transportation Office of the Commonwealth; on the south by Barbosa Avenue; on the east by land belonging to Concepción Viera, and on the west by land be-

longing to Badrena y Pérez, Inc. The Commonwealth deposited a compensation of $328,234.20 in favor of appellants José Luis Pérez and his wife Evangelina López Rodríguez as owners. Subsequent to several incidents characteristic of this kind of proceeding, the case was heard on the merits to fix definitively the just compensation corresponding to appellant-owners.

On August 22, 1968, the trial court rendered judgment based on the following findings of fact:

"1. As a result of the order of this court concerning the claims of lessees David Juarbe Rosado and Castillo Auto Sales, Inc., the State made, in this case, a revision of the original valuation, which was performed by expert Jacinto Matías González in the following manner:

"The condemned land having an area of 5,914.57 square meters was divided into two portions, to wit: one having an area of 3,863 square meters which was valued at $70 per square meter, amounting to $270,410. The other portion, having an area of 2,051.57 square meters, was valued at $15 per square meter, which brought a total of $30,773.55. To this last amount interest was added at the rate of 6% annually drawn from June 8, 1948 to September 30, 1965, date on which the ownership of the property was vested on the State. After adding the interest, the compensation for the latter portion was $65,101.45. The addition of the compensations for both portions showed a total of $335,511.45, from which amount plaintiff's expert deducted the amount of $20,640 which had been paid by the State to lessees David Juarbe Rosado and Castillo Auto Sales, Inc. He also deducted the amount of $6,000 for expenses incurred in the demolition of the buildings and clearing of the land, having credited certain salvage value to the structures in favor of defendant for the amount of $1,665. This computation showed that the value of the land was $310,536.45 which was finally adjusted by plaintiff's appraiser at $310,600.

"2. The area of 2,051.57 square meters assessed at $15 per square meter, to which value interest was added, comprises the portion of land which had been included within the Official Map of Roads, approved on June 8, 1948 by the Planning Board

for the extension of Franklin D. Roosevelt Avenue, plat which was approved by the Governor of Puerto Rico.

"3. The parcel of land taken was part of only one tract of land facing Barbosa Avenue, and, as aforestated, several structures were erected therein, to which the experts of both parties did not assign any value because they are not consistent with the best utilization of the land.

"4. Defendant José Luis Pérez acquired the property on June 15, 1956 by public deed No. 79, executed before notary public Rafael Martínez Álvarez. The original area of the property on the date when defendant acquired it was 6,661.63 square meters and on November 27, 1957, the latter segregated and sold 534.85 square meters thereof; however, the survey performed by plaintiff showed an area of 5,914.57 square meters.

"5. On the date of the taking, the structures erected on the land condemned and part of the land where there were no structures, were leased to different persons, as it appears from Exhibit A of the complaint.

"6. In the light of the reports of both experts the parties agreed that the parcel having an area of 3,863 square meters, which had not been affected by the Official Map of Roads, was valued at $77 per square meter, showing a total of $297,451.

"7. Concerning the value of the parcel having an area of 2,051.57 square meters, affected by the Official Map of Roads, plaintiff maintained that its value had to be fixed as of June 8, 1948, date on which said Official Map became effective. On the contrary, defendant alleged that the value of said portion was the one it had on the date that the condemnation proceeding was filed, that is, September 30, 1965, and that its value per square meter was the same fixed to the portion not affected by the Official Map. The court agreed to this aspect of plaintiff's position and fixed the value of the portion affected by the Official Map at $66,913, that is, a value of approximately $16 per square meter, plus interest at the rate of 6% annually from the date of effectiveness of the Official Map to the date of the taking.

"8. The total compensation fixed for the real property amounts to $364,364, amount which includes $20,640 which was improperly deducted by the State's expert in his revision of the valuation."

The appeal under our consideration challenges the determination of the court accepting the administrative revision of the original valuation of the property made by the State, and fixed to 2,051.57 sq. m. of the total of 5,914.57 sq. m. in the property taken, a compensation based on the market value on June 8, 1948 when the Official Map of Roads went into effect, and not based on the market value on September 30, 1965 when the State took the property and acquired title to it.

The judgment appealed from cannot prevail. There is nothing in the record to show, and there is no finding of fact to that effect either, that the portion of 2,051.57 sq. m. was worth less, for other reasons, than the remaining 3,863 sq. m. of the property. The parties accepted a value of $70 per sq. m. for these 3,863 sq. m. and there is nothing in the record to show that that was not the value for the portion of 2,051.57 sq. m. if a just compensation had been fixed on September 30, 1965, and not on June 8, 1948.

The court upheld its decision, as a matter of law, grounded on the fact that this portion was, since June 8, 1948, *"absolutely not subject to commerce,"* and that therefore, "the owner could not assign, sell or in any manner whatsoever transfer it except to the Commonwealth of Puerto Rico." In support of this conclusion it cited *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365; *Zayas* v. *Planning Board*, 69 P.R.R. 27, 33 (1948); *Municipality* v. *Planning Board*, 68 P.R.R. 600 (1948), and the provisions of § 11 of the Act of May 12, 1942.

Setting aside the question of law in the sense that the inclusion of a property in the Official Map of Roads does not produce the juridical effect attributed by the court as we shall analyze hereinafter, the court concluded, as a matter of *fact*, that appellants acquired this property on June 15, 1956, and recorded the title in the Registry in their favor, that is, subsequent to the effectiveness of the Official Map. Then, as a

matter of fact, the property was subject to commerce and there was a market for it.

In answer to appellant's letters of March 5 and 8, 1965 requesting the determination of the part of the property which was to be occupied by the avenue to be constructed, on March 30, 1965, only 5 months prior to the taking, the Department of Public Works informed him that the sketch plan of the project was in the preliminary stage, and that it was *impossible* to determine on said date, March 30, 1965, "the manner in which his property would be affected for the purpose of marking the boundaries of the portion which we would have to acquire." In a subsequent letter of April 20, 1965, the Department informed appellant that the matter was still under consideration in the Committee on Design of Public Works.

In letters of May 5 and July 22, 1965, the Department informed the owner that it would be necessary to condemn *all* the property, according to the plats for the enlargement of Roosevelt Avenue, and the valuation of the property was being ordered. By letter of September 16, 1965 the Department of Public Works informed appellant that the whole parcel of 5,914.57 sq. m. would be taken and that a price or compensation of $328,234.20 was offered.

Up to this time, and when the action for condemnation was brought, and title thereto was vested on the State on September 30, 1965, the latter did not differentiate as to valuation, between the portion of 2,051.57 sq. m. and the remaining 3,863 sq. m. The record does not contain any evidence contrariwise to those letters, as to when these 2,051.57 sq. m. remained subject to the restrictions of the Official Map of Roads, assuming that, as a matter of law, it were correct that such restrictions rendered the property unmarketable to the effect of a constitutional just compensation.

The Puerto Rico Planning and Budget Act, Act No. 213 of May 12, 1942, provided in its § 11 that the Planning Board

could make, or request the Department of Public Works to prepare, a plat or plats indicating the *precise* location of the lines of future roads and streets; and that said plat or plats should contain the *precise* location of the lines of new, extended or widened roads and streets of Puerto Rico. That after approved by the Board and signed by the Governor, the same would have the force of law. In the same manner the Board would establish an Official Map. Said Official Map would show: (a) all roads and streets existing and established by law as public roads and streets at the time of the adoption of the Official Map and, (b) all road and street locations shown on recorded plats of subdivisions, approved by the Board, which shall, for purposes of use and dedication, be considered public streets.

Furthermore, § 11 expressly provided the following:

"Upon the official map there shall be shown: . . .
"all road and street line plats signed by the Governor in accordance with the provisions of this section and of section 19 of this title. *The making or approval of any such plat or the approval of an official map shall not, in and of itself, determine the construction of any road or street or the taking or acceptance of lands for such road or street purposes.*"[1] (Italics ours.)

In Planning Regulation No. 4, promulgated by the Governor on May 22, 1946, Administrative Bulletin No. 986, Official Map is defined as "Plat or plats indicating the *precise* location of the lines of new, extended or widened roads and streets, as provided in Section 11 of Act No. 213 of 1942."

Section 9 of this Regulation provides for cases of *"special"* appeals before the Board of Building Appeals, created by the Act, and it establishes that such *"special"* appeals are those which are due to hardships caused by special extraordinary circumstances, and the Board was authorized to permit variances to the requirements of the Regulation due to excep-

---

[1] The amendment to § 11 by Act No. 116 of June 29, 1964, did not alter in any manner whatsoever the provision aforecopied.

tional conditions or unreasonable restrictions for the use of premises, and when it is shown that the granting of such variances would alleviate a clearly demonstrable hardship "approaching confiscation."

It was then provided that the Board would consider as *"special"* appeal the one in which it was requested that a *building or land use* permit be granted or denied for premises located wholly or partly "within the line of highways or streets included in an Official Map, or in a 'P' District" and could grant variations to said restrictions when such variations alleviate a clearly demonstrable hardship approaching confiscation.

Section 11 of this Regulation No. 4 provided that "In the case of structures to be erected, altered or moved under *such special permit* within the lines of streets included in an Official Map, or within a 'P' District, the conditions imposed may specify that, *in case of acquisition, compensation will be made in full only for land and for any structure legally erected before the effective date of this Regulation, the owner to receive a limited compensation or no compensation whatever* for the building or other structure for which *the special permit is granted.*" (Italics ours.)

These provisions of Regulation No. 4 of 1946 aforecopied were reaffirmed and remained effective in the revision of said Regulation of 1955—Administrative Bulletin No. 176, 23 R.&R.P.R. §§ 9–51 to 9–54.

In Information Bulletin No. 1 published by the Planning Board in 1954, the Board explains what the Official Map is, in the form of questions and answers, as follows:

"What is the Official Map?
"The Official Map consists of a series of plats or maps which indicate the precise lines of new streets and/or roads to be constructed, or public thoroughfares existing or to be widened, adopted by the Planning Board as part of the Master Plan for the Development of Puerto Rico.

"Does the Official Map play any important function in the planning of the urban development?

"Yes, the adoption of the Official Map provides both the government and the owners with a guide to plan their constructions in the light of the requirements as to the right-of-way of roads to be constructed or widened, contributing thereby to the planning of a good system of urban communications and avoiding the destruction of properties previously constructed in the right-of-way.

"What agency has the responsibility of preventing the construction within the limits of the right-of-way established in an Official Map?

"That responsibility falls on the Bureau of Permits of the Planning Board, which shall not issue *any construction or land use permit in violation of the Official Map*. An aggrieved owner may appeal from the decisions of the Bureau before the Board, and if he does not agree with the determination of the latter, before the Supreme Court of Puerto Rico.

"Can the Official Map be amended?

"Yes, the Board may amend the Official Map after holding a public hearing. But in order that an amendment may have legal effect it must be signed by the Governor.

"Is it true that if an owner is affected by the Official Map in part of his lot he has to give the land to the government?

"That is not true. Any portion of land which is part of a lot affected by the Official Map, *shall be bought or condemned by the government for a just and reasonable value when the work is to be constructed or before, if it is considered convenient*. Only in case of new subdivisions is the developer required to construct totally or partially the roads appearing in the Master Plan or in the Official Map, to serve the house development and its lots." (Italics ours.)

In Information Bulletin No. 9, published by the Planning Board in 1958 in reference to the Official Map (3rd edition), after mentioning the Master Plan and the Official Map, it is stated that the construction of many of the works included in said documents will be delayed for several years, and that within the range of limited resources it is practically impossible to procure the necessary funds *to acquire immediately* all

the lands and properties within the right-of-way of such works for the purpose of constructing them in the future. From that fact, the Bulletin states, there arises the necessity of the Official Map, which constitutes the procedure by which there is established by *precise* methods the line of construction of a street or road to be constructed or widened in the future, *and the construction of private or governmental buildings is prohibited* within that right-of-way, "exercising, therefor, the police power of the State." The Bulletin states that the Official Map retains the right-of-way and maintains it free from constructions until the road is built, and that if *the constructions* were permitted, it would be prohibitive to put the plat into effect later on, in the manner in which it was drafted. Hence, the Bulletin continues, the Official Map prevents, also, the "tremendous social loss" implied by the destruction of properties without actual benefit for anybody.

The Bulletin states further that in extreme cases in which this procedure substantially affects a property, the Planning Board is authorized to *issue a building permit*, even if it is in conflict with the thoroughfare designed, but it may also impose conditions, with respect to the *proposed building*, which are reasonable and within the public interest.

Elaborating the information contained in the Information Bulletin No. 1 aforecopied, Bulletin No. 9 continues:

"Why is the Official Map necessary?

"Because in every well-organized community an adequate system of communication is necessary and the most economical and efficient manner to expedite this purpose is by means of the Official Map. For example, the poor conditions of the traffic, at the present time, in Ponce de León Avenue and Fernández Juncos Avenue in San Juan indicate to us that it is necessary to open new roads on built-up-areas. In the Master Plan, the North Avenue and Martín Peña Express Highway are designed to correct these deficiencies. The cost of these highways will be very high *due to the great number of buildings which must be destroyed or eliminated*. The Official Map provides against the repetition of such acute problems like this one in the future.

"When was the preparation of the Official Map initiated?

"The study of the Official Map, especially with respect to the technique involved in the preparation of the Map, was initiated by the Division of Cartography of the Planning Board during fiscal year 1943–44, but the activities of the actual preparation of the maps were not initiated until the beginning of fiscal year 1944–45 with funds appropriated by the War Emergency Program. Starting in fiscal year 1945–46 until 1948–49 the Legislature made special appropriations every year to continue these activities. From the year 1949–50 the preparation of official maps has been continued with the funds appropriated from the General Budget of Expenses of the Planning Board and at the present time the 'Division of the Official Map' attached to the City Planning Bureau of the Board is in charge of this function.

"What restrictive provisions does the Official Map establish?

"As soon as the Official Map becomes effective *no building, sanitary or use permit may be issued for any building or structure or for any part thereof*, in any land situated within the lines of roads or streets included in said Official Map, *except by authorization of the Planning Board*. A developer affected by a public road included in an Official Map is bound to construct the same or part thereof as part of the urbanization, in the manner provided in the Subdivision Regulation.

"Who is in charge of enforcing compliance with the Official Map?

"The Permit Official is bound by law *not to authorize the construction of any building* within the right-of-way of the highways or streets included in the Official Map.

"Does the preparation or adoption of an Official Map mean that the works will be performed immediately?

"The Planning Act clearly establishes that the preparation or adoption of an Official Map 'shall not determine, in and of itself, the construction of any road or street *or the taking or acceptance of lands* for such road or street purposes.' This means that the preparation of an Official Map does not mean, in any manner whatsoever, that the works will be initiated immediately. It indicates, however, that there are definite plans for the construction of such roads as part of the development of the area where the same is located.

776

"How does the Official Map affect the owners?

"The Official Map gives the impression *that it freezes the properties but this is not the truth.* For example,. in an Official Map passing through a city almost all the lots are built-up lots. The owners of the properties may enjoy the latter and repair them. At the time the thoroughfare is to be constructed the government acquires said properties and pays for the latter their just market value. In cases of Official Maps passing through the rural zone the owners may continue utilizing the space of the thoroughfare for the customary agricultural use.

"In the case of Official Maps of Main Streets in urban zones the latter consist in the widening of existing streets and few buildings are entirely affected.

"Does the government buy properties affected by the Official Map prior to the construction of the public thoroughfares?

"In *precarious cases* when the property is actually frozen and in which the owner *is suffering great financial troubles,* the Department of Public Works buys these properties pursuant to laws which make appropriations therefor."

█ From the legislative provision contained in § 11 of the Planning Act itself, as well as from the administrative interpretation of the Agency created by it to be in charge of the enforcement of the Law, interpretation set forth in the form of Regulations having the force of law, there clearly appears an expression of public policy to the effect that the adoption of an Official Map of Roads affecting a particular property does not constitute, at the time of the adoption of the Map, the taking of the affected property by the State, nor does it constitute an intention to acquire title to the same at that time.

█ The aforecited Act and Regulations prove that the public policy of the State is completely contrary to the judgment appealed from. See also Act No. 60 of June 20, 1958 which exempted totally or partially the property affected by an Official Map from the payment of land taxes. As has been seen, the. Official Map is directed principally to the function of the Board to issue or not to issue *construction* permits .in

order that such construction permits shall not be issued in places where a thoroughfare is platted to prevent that upon acquiring the right-of-way at the proper time, the State would have to pay also the value of the construction. Even so, the Regulations permit, as may have been observed, that construction permits be issued in such cases subject to certain conditions if the Official Map creates, in relation to a particular property, an unreasonable restrictive situation approaching confiscation.

The public policy on this particular has been and continues to be diaphanously clear. Of course, the courts shall always be the ones which, in view of a particular state of fact, shall decide, in last instance, whether the restrictions of an Official Map have had the effect of an unconstitutional confiscation of the property in the light of particular circumstances. The foregoing, however, presents an entirely different situation to the question at bar. This suit does not involve the reasonableness of a restriction over the property imposed by the Official Map, nor whether the same is confiscatory, nor are the courts requested to either eliminate the restriction of the Official Map or compel the State to compensate the value by acquiring title. In this case the State has condemned and acquired title. The only question involved herein is the just constitutional compensation for the title taken.

From the examination of the record before us we cannot conclude that these 2,051.57 sq. m. were subject to an Official Map as of June 8, 1948. On the contrary, the letters and the plat presented in evidence indicate another thing. But, even if it were accepted that it was so, as a matter of fact, that they were subject to an Official Map as of June 1948, as a matter of law, it would not be correct to conclude that on said date there was a taking of the 2,051.57 sq. m. by the State by condemnation.

■ It would not be correct either to conclude at law, in the light of the applicable Act and Regulations, that the adop-

tion of an Official Map impairs the right of the owner to dispose of his property in the market, since the very Official Map, having force of law, constitutes a notice *erga omnes* of the construction restrictions imposed by the Map. See: *Waymouth Corp.* v. *Planning Board*, 80 P.R.R. 599 (1958), where we said (p. 601): "The fact that a great portion of said land is reserved for public use does not mean that the *right of ownership* . . . is wholly suspended." (Italics ours.)

All there was in June 1948, assuming that the 2,051.57 sq. m. were already affected, was the exercise of the regulating police power by the State. As the exercise of such police power, and not condemnation power, the cases of *Municipality* v. *Planning Board, etc.*, 68 P.R.R. 600 (1948), and *Zayas* v. *Planning Board*, 69 P.R.R. 27 (1948), are illustrative. *Euclid* v. *Ambler*, 272 U.S. 365, is likewise illustrative of the police power.

We have reviewed the decisions and the opinions of the commentators on this particular, and we believe that it can be affirmed without fear of mistake that the doctrine establishes the unquestionable principle that the adoption of an Official Map of thoroughfares does not constitute a condemnation of the property because of the mere fact of such adoption, and that there is no taking of the property by the State on the date of the adoption.

What has given rise to considerable litigation and expression of opinion is the fact as to whether the restrictions imposed by an Official Map on the property are of such unreasonable or confiscatory nature in a determined situation and circumstance to warrant the declaration of the courts that there has been a confiscation without pay. Our Board Regulations themselves understand that such situations may arise, and intends to provide a remedy for meritorious cases.

Generally, the courts have decided in view of such situations, that there has been no condemnation or confiscation without just compensation, but the exercise of the *police*

*power*, except in those really extreme cases. Even in such extreme cases the remedy need not be the confiscation only. There may be others, like the elimination of the restrictions or their reduction to a level of reasonableness. But, as we stated before, this problem is not involved herein.

The court assimilated this case to the situation known in the North American States case law as an appropriation without taking. Using the same descriptive term used by the court, a *"Non Physical Taking"*, it concluded that "the *'Non Physical Taking'* of the strip of land object of this action occurred and took effect on June 8, 1948."

It does not seem to us that the case at bar, in the light of the applicable law and regulations and of its facts, may be governed by said theory. The characteristic situation of a condemnation with "non physical taking" is present in *United States* v. *Causby*, 328 U.S. 256 and *Armstrong* v. *United States*, 364 U.S. 40, and cases cited therein.[2]

The Solicitor General emphatically invokes our judgment in *Commonwealth* v. *Rosso*, 95 P.R.R. 488 (1967), in his discussion of the problem raised herein, and seeks to assimilate both situations. The judgment in *Rosso*, which has been

---

[2] In the *Causby* case the Federal Government leased a municipal airport for the taking off and landing of military aircraft. The minimum safe altitude for taking off and landing in this place was 83 feet, directly above the farm of a person engaged in poultry raising, and the airplanes flew 67 feet above the roof of his residence, 63 feet above the barn, and 18 feet above the top of the tallest tree. The airport was used 11% of the time for taking off and landing. The noise and the lights caused great inconveniences to the persons and the destruction of the poultry raising business.

In view of said circumstances it was held that the government had taken an easement over the property, which easement was compensable under the Fifth Amendment.

In *Armstrong*, it was held that when the Federal Government undertook the completion of the construction of certain boats which had been contracted by a private entity, a lien which the materialmen had in their favor was destroyed under the State law, if said lien could not be enforced against the government. The Supreme Court held that said lien had a property value, compensable under the Fifth Amendment. See other examples cited in these cases.

characterized as the exercise of the power of eminent domain for the creation of a "Land Bank",[3] does not involve the problem of constitutional just compensation for the property taken. On the contrary, if there is anything clearly reestablished in *Rosso* it is the principle that, although the determination, as to what a public or social interest or necessity is, is incumbent upon the Legislature with entire preference to the Judicial Power, except in a special unreal situation, the function of fixing the just compensation for the use of the private property for public utility or social benefit falls upon the exclusive jurisdiction of the courts, since "just compensation" is a constitutional rather than a legislative concept.[4]

■ We need not elaborate the doctrine, already axiomatic, that the constitutional just compensation is fixed on the date of the taking of the title of ownership by the State, and it is fixed according to certain factors well-known in the rule of Law, factors which are not involved herein. *People* v. *Carmona*, 70 P.R.R. 292 (1949) ; *People* v. *Huyke*, 70 P.R.R. 720 (1950) ; *Housing Authority* v. *Sagastivelza*, 72 P.R.R. 262 (1951) ; *Commonwealth* v. *Fonalledas*, 84 P.R.R. 552 (1962).

—O—O—O—

There are additional considerations.

If the constitutional rule of compensation adopted by the trial court were upheld, an even more prejudicial situation for the appellant-owners would be created.

On June 8, 1948, the court fixed a value of $66,913 for the 2,051.57 sq. m., at the rate of $16 per sq. m. At the rate of $16 per sq. m. these 2,051.57 sq. m. were compensated at $32,825.12. The difference between the amount of $34,087.88 and the amount of $66,913 granted, represents interest at

---

[3] David L. Callies, *"Commonwealth of Puerto Rico v. Rosso: Land Banking and the Expanded Concept of Public Use"*, 2-1 Prospectus, A Journal of Law Reform 199 (1968), University of Michigan Law School.

[4] Constitution of the Commonwealth of Puerto Rico, Art. II, § 9.

the rate of 6% annually on $32,825.12 from June 8, 1948 until September 30, 1965, when the taking of the title occurred.

The Constitution of the Commonwealth of Puerto Rico provides that public funds shall only be disposed of pursuant to law. The Act of March 14, 1907, as amended—3 L.P.R.A. § 255—provides that disbursements of public moneys or funds of the Commonwealth of Puerto Rico shall not be made except on warrant drawn by the Secretary of the Treasury and countersigned by the Governor. Section 102 of the Political Code provides that the Secretary of the Treasury shall issue and sign all warrants for the payment of money from the Commonwealth Treasury, "which may be authorized by law."

We have said in condemnation cases that although the State is the initial actor, defendant, in fact, becomes the actor in the litigation for a compensation in excess of the amount deposited. *Cf. People* v. *García,* 66 P.R.R. 478, 481 (1946); *Martínez* v. *Superior Court,* 85 P.R.R. 1 (1962). Thus the substantive provisions of law referring to any additional compensation affecting the State should be strictly complied with.

The legal authority, pursuant to the constitutional provision and the laws cited, to order the disbursement of public moneys by way of *interest* in cases of condemnation, appears from §§ 5(a) and 5(b) of the Act of March 12, 1903, as amended, 32 L.P.R.A. §§ 2907 and 2908.
Section 2907:

"As soon as said declaration of taking and delivery is filed and the deposit is made in the court, for the benefit and use of the natural or artificial person or persons entitled thereto, of the amount estimated as compensation and specified in said declaration, title to the said property in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the Commonwealth of Puerto Rico or in the Commonwealth Government, or in the agency or instrumentality

of the Commonwealth of Puerto Rico which may have requested the expropriation, or in the plaintiff or petitioner other than the Commonwealth of Puerto Rico, and such property shall be deemed to be condemned and acquired for the use of the Commonwealth of Puerto Rico or of the Commonwealth Government, or of the agency or governmental instrumentality of the Commonwealth of Puerto Rico which may have requested the expropriation, or of the corresponding housing authority, of the municipality in question, or of the Government of the Capital, as the case may be, and the right to just compensation for the same shall vest in the person or persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein; *and the said judgment shall include, as part of the just compensation awarded, interest at the rate of six per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been deposited and paid into the court.* No sum so deposited and paid into the court shall be subject to any charge for commission, deposit, or custody." (Italics ours.)

Section 2908:

"In any judgment rendered in a condemnation proceeding for the acquisition of private property or of any right therein for public use of utilization for the benefit of the community, which is instituted by the Commonwealth of Puerto Rico or the Commonwealth Government directly or on its behalf by any agency, authority, or instrumentality or officer of the Commonwealth of Puerto Rico, in which the amount determined by the court as just compensation for such property or the rights therein, the object of such proceedings, both in case of conveyance of title and in case of mere taking without conveyance of title, is greater than the amount fixed by the said plaintiff and deposited in the court as just compensation for such property or the rights therein, the Commonwealth of Puerto Rico shall pay the amount of the difference between the sum thus fixed by the said plaintiff and deposited by him in the court and the sum that for the purpose has been determined by the court as just compensation for said property or the rights therein, the object of such proceeding, *with interest at the rate of six per centum*

*per annum on such difference, to be computed from the date of the acquisition of such property or rights therein up to the date of the payment of such difference;* Provided, That in such cases in which the defendant or defendants appeal from the judgment fixing the compensation, and the Supreme Court confirms said judgment or reduces the compensation granted, *the appellant shall not recover interest for the period of time comprised between the date of the filing of the appeal and until the judgment of the Supreme Court is final, firm and executory.*

"As soon as the judgment referred to in the preceding paragraph is final and unappealable, the Secretary of the Treasury of Puerto Rico shall pay to the defendant in such condemnation proceedings the amount of the difference specified in the preceding paragraph, *with interest thereon,* as therein specified, and the Secretary of the Treasury of Puerto Rico shall pay *such difference and interest thereon,* as provided in this section, chargeable to any funds in the Commonwealth Treasury not otherwise appropriated.

"For the payment in full of the difference referred to in the preceding paragraphs and the interest thereon, as herein provided, the good faith of the Commonwealth of Puerto Rico is hereby irrevocably pledged." (Italics ours.)

■■ There is no authority at law to impose interest covering any period whatsoever *prior* to the "date of the taking," in this case September 30, 1965, nor to cover any amount other than the difference between the deposit and the amount of the final adjudication of the value, subject to the adjustments of §§ 5(a) and 5(b) themselves. Furthermore, the interest having been fixed from 1948 to 1965 as part of the compensable value of the 2,051.57 sq. m., in fixing the interest authorized on the difference between the deposit and the value of the property finally determined, the interest would be partially compounded, not authorized by law either.

For the reasons stated, the judgment appealed from will be reversed insofar as the fixing of a just compensation to 2,051.57 sq. m. of the total of the 5,914.97 sq. m. condemned on the basis of the value on June 8, 1948, and another will be rendered fixing just compensation on the basis of the value

on September 30, 1965, date of the taking of the title. There appearing no controversy as to the value of the property on the latter date, at the rate of $70 per square meter, and since a lower value had been fixed to the said 2,051.57 sq. m. only according to the rule of law applied, which does not prevail, the same value of $70 shall be fixed to the latter in the judgment.

Mr. Chief Justice Negrón Fernández, Mr. Justice Rigau, Mr. Justice Dávila, and Mr. Justice Torres Rigual did not participate herein.