IN REVIEW OF ADMINISTRATIVE PROMULGATION OF THE HEALTH CARE ADMINISTRATION BOARD: N. J. A. C. 8:30–14.1 THROUGH N. J. A. C. 8:30–14.6, NEW JERSEY ASSOCIATION OF HEALTH CARE FACILITIES, A CORPORATION NOT FOR PROFIT OF THE STATE OF NEW JERSEY, AND WAYNE HAVEN NURSING HOME, VALLEY NURSING HOME, PINE REST NURSING HOME, DUNROVEN NURSING HOME, ALLENDALE NURSING HOME, WELLINGTON HALL NURSING HOME AND WOODCLIFF LAKE MANOR NURSING HOME, APPELLANTS, v. JOANNE E. FINLEY, M.D., STATE COMMISSIONER OF HEALTH, AND THE HEALTH CARE ADMINISTRATION BOARD, RESPONDENTS, AND PUBLIC ADVOCATE OF NEW JERSEY, RESPONDENT-INTERVENOR.

Superior Court of New Jersey
Appellate Division

Argued February 26, 1979—Decided May 1, 1979.

Before Judges CONFORD, PRESSLER and KING.

*Mr. Jonathan D. Weiner* argued the cause for appellant New Jersey Association of Health Care Facilities.

*Mr. Adrian M. Foley, Jr.* argued the cause for appellants Wayne Haven Nursing Home, Valley Nursing Home, Pine Rest Nursing Home, Dunroven Nursing Home, Allendale Nursing Home, Wellington Hall Nursing Home and Woodcliff Lake Manor Nursing Home (*Messrs. McElroy, Connell,*

*Foley & Geiser,* attorneys; *Mr. R. Peter Connell* on the brief).

*Mr. Frederick S. Title,* Deputy Attorney General, argued the cause for respondents (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

*Mr. Arthur Penn,* Assistant Commissioner, Department of the Public Advocate, argued the cause for respondent-intervenor *Mr. Stanley C. Van Ness,* Public Advocate, attorney).

*Ms. Toby S. Edelman* filed a brief on behalf of *amicus curiae* Gray Panthers.

The opinion of the court was delivered by

CONFORD, P. J. A. D. (retired, temporarily assigned). These are consolidated appeals challenging the validity of an administrative regulation, *N. J. A. C.* 8:30–14.1 to 14.6, which was promulgated by the Commissioner of Health and the Health Care Administration Board ("Board") Appellants are the New Jersey Association of Health Care Facilities ("New Jersey Association") and several private nursing homes ("Private Homes").

On November 10, 1977 the Commissioner of Health published in the *New Jersey Register* proposed regulations which would require nursing homes to make available a "reasonable number" of their beds to indigent persons as a condition of licensure or relicensure. See 9 *N. J. R.* 516. Pursuant to the notice numerous comments were received from interested persons concerning the proposed regulation. On January 5, 1978 the Commissioner, with the approval of the Board, finally adopted *N. J. A. C.* 8:30–14.1 *et seq.,* entitled "Beds for Indigent Persons," and the regulation was published and took effect February 9, 1978.

Appeals therefrom were filed by both the New Jersey Association and the Private Homes. The Division of Public Interest Advocacy was granted leave to intervene, and subsequently the Attorney General filed a motion to consolidate all the appeals, which was granted. A motion to stay implementation of the regulations was denied by the court.

The record before us amply demonstrates that *N. J. A. C.* 8:30–14.1 *et seq.* was adopted in an effort to alleviate the acute shortage of long-term care nursing home beds available for indigent persons in this State. Apparently, state-licensed nursing homes were largely unwilling to voluntarily accept and treat indigent patients. Although the State Medicaid program reimbursed qualified nursing homes which voluntarily accepted indigents for their care at standard rates, the homes could generally obtain greater fees from private paying patients than from Medicaid reimbursement. This fact led to the unwillingness of many private nursing homes to accept indigent persons. Consequently there developed a severe shortage of accommodations for indigents. Whereas it normally took one to three days for a private pay patient to find an available nursing home bed, it often required six to eight months for a Medicaid eligible patient. As a consequence of this acute shortage many Medicaid eligible patients needing nursing home care had to remain in their homes or in general care hospitals or other institutions unsuited to their requirements for undue periods or indefinitely. Another critical situation was presented by the plight of paying patients who were forced to vacate when their financial resources were depleted (so-called "transfer-trauma").

Sometime in 1975 the then Director of the State Medicaid program wrote to the Department of Health inquiring whether Medicaid-financed beds could be required of nursing homes as a condition of licensure. In turn, the Department of Health requested a formal opinion on the matter from the Attorney General. At that time he advised that it could not legally "include in its health facility licensing standards a

requirement that proprietary facilities accept and treat a certain number of indigent patients." The Attorney General further opined that such a regulation was not a proper subject of licensing regulations, which he said might deal only with a health facility's day-to-day physical, fiscal and professional operations.

In December 1976 the Public Advocate filed a Petition for Rule-Making with the Department of Health, requesting the Commissioner to adopt regulations requiring nursing homes to set aside a "fixed percentage of [their beds] to indigent persons" as a condition of state licensure. The Public Advocate criticized the Attorney General's opinion and urged that it not be followed. At first the Commissioner of Health stood on the Attorney General's advice and denied the request of the Public Advocate. Thereupon, the latter filed an appeal to this court challenging the validity of the Commissioner's determination that she lacked the authority to adopt the proposal. However, during the pendency of that appeal the Attorney General rendered a second opinion reversing his earlier position. He now indicated that a requirement for the provision of a certain number of beds for indigent persons was consistent with the Department's authority, pursuant to *N. J. S. A.* 26:2H–12(b), to examine the rules and bylaws of a health care facility to ascertain that its rules are "fit and adequate" and that a licensee is in compliance with the act. Accordingly, the Commissioner drafted the prototype regulation and the Public Advocate voluntarily dismissed his appeal.

At an October 6, 1977 meeting of the Health Care Administration Board, representatives of the nursing home industry, who had already received copies of the proposed regulations prior to the meeting, were permitted to voice their objections to the Board before the regulations were officially published for public comment. After a lengthy discussion of the merits of the proposed regulations and some minor changes in language, the Board voted to approve them for initial publication.

Numerous comments, both in favor and critical of the regulations, were received and considered by the Department of Health. Indeed, several of the comments led to the adoption of minor changes in order more fully to realize the intent of the regulations. For example, the term "percentage" in *N. J. A. C.* 8:30–14.4(a) as published on November 10, 1977 was changed to "reasonable number" to harmonize that section with *N. J. A. C.* 8:30–14.4(b). Moreover, the fact that many charitable, nonprofit and life care community nursing homes already provided extensive services to indigent patients and thereby met their fair share of the industry obligation to service indigents was recognized. See *N. J. A. C.* 8:30:14.4(a)(1). In order further to increase administrative flexibility, and prevent the "transfer trauma," mentioned above, experienced by elderly patients when forced to leave a familiar nursing home, the Department was authorized to require facilities to maintain all present patients despite a change in their economic status and to include them in the fair share calculation under the regulation. *N. J. A. C.* 8:30–14.4(a).

Appellants argue that the challenged regulations go beyond the powers delegated to the Department of Health by its enabling legislation, *N. J. S. A.* 26:2H–1 *et seq.,* and are therefore *ultra vires.* Specifically, they contend that *N. J. S. A.* 26:2H–1 *et seq.* establishes two separate and distinct functions, one being planning and the other licensing, and that the Department's responsibility to insure that health care services are available to meet the needs of our citizenry is limited to the exercise of those functions. Moreover, it is argued that the licensing function applies exclusively to the quality of services afforded by nursing homes, such as conditions relating to the standards of patient care, while the planning function is similarly confined to the certificate of need process, which deals with proposed new facilities or expansion of existing facilities. It is argued that since the challenged regulations are relevant only to the function of passing on applications for certificates of need, not to the licensing

function, they are *ultra vires* and invalid as conditions of licensure. This was essentially also the view of the Attorney General in his first formal opinion concerning the precursor to *N. J. A. C.* 8 :30–14.1 *et seq.*

■ It is beyond dispute that *N. J. S. A.* 26 :2H–1 *et seq.* neither expressly prohibits nor permits the regulations in question. However, in determining whether a particular administrative action enjoys statutory authorization, the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its origin and objectives. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N. J.* 544, 562 (1978) ; *In re Suspension of Heller,* 73 *N. J.* 292, 303 (1977). The purpose of such an inquiry is to ascertain whether the requisite authority may be said to be implicitly supplied, as "[t]hat which is implied is as much a part of the law as that which is expressed." *Ibid. In re Gastman,* 147 *N. J. Super.* 101, 109 (App. Div. 1977).

■ *N. J. S. A.* 26 :2H–1 sets forth the policy of the Health Care Facilities Act as follows:

### I. LICENSES AND REGULATION
26 :2H–1. Declaration of policy

It is hereby declared to be the public policy of the State that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health. In order to provide for the protection and promotion of the health of the inhabitants of the State, the State Department of Health, which has been designated as the sole agency in this State for comprehensive health planning under the "Comprehensive Health Planning and Public Health Services Amendments of 1966" (Federal Law 89–749), as amended and supplemented, shall have the central, comprehensive responsibility for the development and administration of the State's policy with respect to health planning, hospital and related health care services, and all public and private institutions, whether State, county, municipal, incorporated or not incorporated, serving principally as boarding, nursing or maternity homes or other homes for the sheltered care of adult persons or as facilities for the prevention, diagnosis, or treatment of human disease, pain, injury, deformity or physical condition, shall be subject to the provisions of this act.

This section of the act imposed on the Department the comprehensive responsibility for developing and administering the legislative policy of insuring health care services that meet the needs of the citizenry of this State. As is evident, the declaration of legislative policy is not limited merely to the certificate of need or licensing functions. As the sole state agency charged with comprehensive health planning, the Department of Health must strive to achieve the objectives of the National Health Planning and Resources Development Act (42 *U. S. C. A.* § 300k *et seq.*), which includes equal access by all people to quality health care services. See 42 *U. S. C. A.* § 300k(a).(1) (Supp. 1974–1977).

It is well settled that declarations of public policy in enabling legislation can serve as sources of authorization for regulations related to the furtherance of that policy. *In re Promulgation of Rules of Practice,* 132 *N. J. Super.* 45, 49 (App. Div. 1974), certif. den. 67 *N. J.* 95 (1975). This is especially true where, as here, the declaration of legislative policy is couched in such broadly comprehensive terms. *Ibid.* Moreover, the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities, and the courts should readily imply such incidental administrative powers as are necessary to effectuate fully the legislative intent. *New Jersey Guild of Hearing Aid Dispensers v. Long, supra; In re Suspension of Heller, supra.* Where, as here, the task of the administrative agency is "to protect the health and welfare of members of the public" a grant of implied powers is to be readily inferred. *Cf. In re Suspension of Heller, supra,* 73 *N. J.* at 303–304.

If the Department of Health has the authority pursuant to *N. J. S. A.* 26:2H-1 to promulgate regulations requiring health providers to deliver needed services, then it follows in our view that it may employ its licensing function to enforce those regulations. Indeed, *N. J. S. A.* 26:2H-13 provides, in pertinent part, that the Department may re-

voke a license for failure to comply "with the provisions of this act, or the rules and regulations promulgated hereunder." See also, *N. J. S. A.* 26:2H–12(b)(2), which provides, among other things, that a license shall be issued by the Department upon its findings that "there is reasonable assurance the health care facility will be operated in the manner required by this act and the rules and regulations thereunder."

■ Application of the foregoing principles to the appellants' challenge of the instant regulations on *ultra vires* grounds confirms that the regulations do not exceed the authority delegated to the Department of Health by the act. The extremely circumscribed scope of the statutory purposes implicit in appellants' position hardly comports with the liberal construction mandated for administrative regulations in the field of public health and welfare. *In re Suspension of Heller, supra,* 73 *N. J.* at 303–304.

Appellants next contend that the regulation takes their property for a public use without just compensation. The general thrust of their argument is that the challenged regulations require them to provide beds for indigents — a public purpose — at the expense of their right to sell their services on the open market for what the traffic will bear.

■ The general question as to when governmental action amounts to a taking of property has always presented a "vexing and thorny problem." *Washington Market Enterprises v. Trenton,* 68 *N. J.* 107, 116 (1975). Indeed, a determination of where valid regulation ends and taking begins is not capable of any set formula or definition but must turn on the facts in each case. *Goldblatt v. Town of Hempstead,* 369 *U. S.* 590, 594, 82 *S. Ct.* 987, 8 *L. Ed.* 2d 130 (1962); *Bayshore Sew. Co. v. Dep't of Environment,* 122 *N. J. Super.* 184, 204–205 (Ch. Div. 1973), aff'd o. b. 131 *N. J. Super.* 37 (App. Div. 1974). However, the constitutional purpose is clear. If there has been a taking, both the Federal and State Constitutions require the payment of just compensation. *U. S. Const.,* Amends. V and XIV; *N. J.*

*Const.* (1947), Art. I, § 20. Conversely, if there has not been a taking, any loss that may be suffered as incident to governmental action under the police power is *damnum absque injuria. Washington Market Enterprises, supra,* 68 *N. J.* at 116. Moreover, the burden of proof rests "heavily" upon the parties alleging confiscation to demonstrate it. *Hutton Pk. Gardens v. West Orange Town Council,* 68 *N. J.* 543, 570 (1975).

In order to demonstrate that the challenged regulations effect a taking without just compensation, appellants rely on cases where there were takings of private property for public use for no or nominal compensation, *Phillips Petroleum Co. v. Corporation Comm'n of Oklahoma,* 312 *P.* 2d 916 (Okl. Sup. Ct. 1957); *Capital Transit Co. v. Bosley,* 191 *Md.* 502, 62 *A.* 2d 267 (Ct. App. 1948), or where regulatory measures were held to be confiscatory despite the fact that the private property involved was not rendered totally useless. *Armstrong v. United States,* 364 *U. S.* 40, 80 *S. Ct.* 1563, 4 *L. Ed.* 2d 1554 (1960); *Washington Market Enterprises v. Trenton, supra.* However, those cases are inapposite to the instant case since *N. J. A. C.* 8:30–14.1 *et seq.* has built-in safeguards against compelled use of the regulated homes without just compensation.

*N. J. A. C.* 8:30–14.5(c) specifically provides that the affected nursing homes "shall be entitled to a reasonable rate for Medicaid patients" consistent with established Medicaid reimbursement procedures. Moreover, even after an initial determination has been made that a nursing home facility must make available a specified number of its beds for indigents, the home is entitled to a plenary hearing at which it may submit a detailed cost analysis substantiating a position that it cannot earn a just and reasonable return on its equity if required to accept that number of indigents. *N. J. A. C.* 8:30–14.5(d)(i). If the final administrative decision is adverse to the nursing home, it has the right to judicial review. *N. J. S. A.* 26:2H–17. Thus, it is abun-

dantly clear that the challenged regulations are at pains to provide adequate assurance against unfair or confiscatory treatment of the homes.

Concededly the challenged regulations may prevent a nursing home from obtaining the maximum return available in an unregulated market. But that fact does not render the regulations invalid. Not every state action which interferes with an individual's unrestricted use of his property is confiscatory; it is elementary that many governmental regulations which necessarily "restrict property rights and the freedom of contract" have been sustained as valid exercises of the police power. *Rothman v. Rothman*, 65 *N. J.* 219, 226 (1974). It is well settled that laws and regulations relating to the health, comfort, convenience, good order and general welfare of the citizenry, though they may disturb the plenary enjoyment of individual property rights, may be valid though no provision is made for compensation for such disturbance. *State v. Mundet Cork Corp.*, 8 *N. J.* 359, 369–370 (1952). As indicated above, the instant regulations specifically provide for compensation for use of the facilities. In any event, governmental control and regulation of rates in appropriate areas affected with the public interest, if reasonable, is well within the State's comprehensive police powers. *Hutton Pk. Gardens v. West Orange Town Council*, 68 *N. J.* 543 (1975) (rent control) ; *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (E. & A. 1935) (milk prices) ; *Dock Watch Hollow Quarry Pit v. Warren Tp.*, 142 *N. J. Super.* 103 (App. Div. 1976), aff'd o. b. 74 *N. J.* 312 (1977) (restriction on quarrying below a certain grade).

It is beyond dispute that the challenged regulations were intended to remedy a social problem affecting the health and welfare of the aged and infirm poor. The area of concern is indeed one affected with a public interest sufficient to invoke the protective umbrella of this regulation.

Appellants next contend that *N. J. A. C.* 8:30–14.1 *et seq.* is manifestly vague and ambiguous in that it lacks definite

standards as to how and under what circumstances they will be reimbursed and how many indigents they will be required to accept. In particular, objection is taken to such terms as "reasonable number of beds," "reasonable number of indigents" and "reasonable rate." *N. J. A. C.* 8:30–14.4(a), 14.5(3)(c), respectively.

The basic principle here pertinent is that a statute is bad only if it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application. *State v. Smith,* 46 *N. J.* 510, 518 (1966); *Handelsman v. N. J. Real Estate Comm'n Dir.,* 101 *N. J. Super.* 244, 248 (App. Div. 1978), certif. den. 52 *N. J.* 485 (1968). Although these cases concern statutes, the same standards are applicable to the validity of administrative regulations. *Essex Cty. Welfare Bd. v. Klein,* 149 *N. J. Super.* 241, 247 (App. Div. 1977); *Hoeganaes Corp. v. Div. of Taxation Dir.,* 145 *N. J. Super.* 352, 359 (App. Div. 1976).

Within the confines of specificity discussed above, it is recognized that regulations of certain kinds of subject matter and statutes must of necessity be general. *Hoeganaes Corp. v. Div. of Taxation Dir., supra,* 145 *N. J. Super.* at 360. This is such an area. Thus such standards as "just and reasonable," "fair return," and "excessive profits" have been approved by the courts in other comparable regulatory contexts. *Ward v. Scott,* 11 *N. J.* 117, 124–125 (1952); *State v. Owens-Corning Fiberglas Corp.,* 100 *N. J. Super.* 366, 383 (App. Div. 1968), aff'd o. b. 53 *N. J.* 248 (1969). *Hutton Pk. Gardens v. West Orange Town Council, supra* 68 *N. J.* at 568–570.

In respect of the contentions as to vagueness of the regulations, it has been conceded by the Attorney General at oral argument that a nursing home which is unable to qualify for Medicaid cannot be denied licensure if it refuses to accept indigents as it is the intention of the regulation that only Medicaid-eligible patients are required to be accepted by a nursing home under the regulation. While we are conscious

of the concern of the homes that Medicaid reimbursement may not equal the cost of maintaining an indigent, we do not regard this circumstance as fatal to the scheme of the regulation where a licensee cannot estabish that its overall operation yields it less than a "just and reasonable return on equity." *N. J. A. C.* 8:30–14.4(b),(6)(i). We see nothing invidious in the notion that to establish such a return the home may have to charge its paying patients sufficient to enable it to carry a reasonable number of Medicaid patients.

Finally, appellants argue that the lack of specific subordinate criteria for determination of the "reasonable number" of beds for indigents required by the Department of a particular facility invalidates the regulation. We think not. The regulation sets forth a number of relevant factors to be weighed in arriving at the determination in a particular case. These include the extent and location of bed shortage, the length of time indigents must wait for nursing home placement, the state health plan and the plans of the various Health Systems Agencies, the ability of the home to make a reasonable profit if required to accept a particular number of indigents and other factors. *N. J. A. C.* 8:30–14.4 (b). From the nature of the problem and the variables in attendant circumstances affecting different nursing homes, we conclude the regulatory provisions are fair, reasonable and practicable. That they are not impeccable specimens of draftsmanship does not impugn their legality. The procedural and judicial safeguards available against arbitrary determinations under the regulation go far to support its validity. *Cf. Motyka v. McCorkle,* 58 *N. J.* 165, 178 (1971); *State v. Trap Rock Industries, Inc.,* 116 *N. J. Super.* 353, 357 (App. Div. 1971).

We have carefully considered other objections offered against the validity of the regulation and find them without merit.

The regulation under challenge is adjudged valid. No costs.