## ARMSTRONG et al. *v.* UNITED STATES.

·No. 270.   Argued March 28, 1960.—Decided June 27, 1960.

*Burton R. Thorman* argued the cause for petitioners. With him on the brief was *Solomon Dimond.*

*Samuel D. Slade* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub* and *Seymour Farber.*

MR. JUSTICE BLACK delivered the opinion of the Court.

In this action petitioners assert materialmen's liens under state law for materials furnished to a prime contractor building boats for the United States, and seek just compensation under the Fifth Amendment for the value of their liens on accumulated materials and uncompleted work which have been conveyed to the United States.

The United States entered into a contract with the Rice Shipbuilding Corporation for the construction of 11 navy personnel boats. The contract provided that in the event of default by Rice, the Government could terminate the contract and require Rice to transfer title and deliver to the Government all completed and uncompleted work together with all manufacturing materials acquired by Rice for building the boats. Petitioners furnished various materials to Rice for use in construction of the boats. Upon Rice's default, the Government exercised its option as to 10 of the boat hulls still under construction; Rice executed an itemized "Instrument of Transfer of Title" conveying to the United States the hulls and all manufacturing materials then on hand; and the Government removed all of these properties to out-of-state naval shipyards for use in the completion of the boats. When the transfer occurred, petitioners had not been paid for their materials and they have not been paid since. Petitioners therefore contended that they had liens under Maine law which provides that "[w]hoever furnishes labor or materials for building a vessel has a lien on it therefor, which may be enforced by attachment thereof within 4 days after it is launched . . . . He also has a lien on the materials furnished before they become part of the vessel, which may be enforced by attachment . . . ." Maine Rev. Stat., 1954, c. 178, § 13.

Claiming valid liens on the hulls and manufacturing materials at the time they were transferred by Rice to the

United States, petitioners asserted that the Government's action destroyed their liens by making them unenforceable and that this constituted a taking of their property without just compensation in violation of the Fifth Amendment.[1] The Court of Claims, relying on *United States* v. *Ansonia Brass & Copper Co.*, 218 U. S. 452, held that petitioners never acquired valid liens on the hulls or the materials transferred to the Government and that therefore there had been no taking of any property owned by them. —— Ct. Cl. ——, 169 F. Supp. 259. We granted certiorari. 361 U. S. 812.

I.

The Court of Claims reached its conclusion from the correct premise that laborers and materialmen can acquire no liens on a "public work." *Hill* v. *American Surety Co.*, 200 U. S. 197, 203; *Equitable Surety Co.* v. *McMillan*, 234 U. S. 448, 455; *United States* v. *Munsey Trust Co.*, 332 U. S. 234, 241. It reasoned that because the contract between Rice and the United States contemplated that title to the vessels would eventually vest in the Government, the Government had "inchoate title" to the materials supplied by petitioners, rendering such materials "public works" immune from the outset to petitioners' liens. We cannot agree that a mere prospect that property will later be owned by the United States renders that property immune from otherwise valid liens.

The sovereign's immunity against materialmen's liens has never been extended beyond property actually owned by it. The *Ansonia* case itself, upon which the Court of

---

[1] The relevant portion of the Fifth Amendment provides, ". . . nor shall private property be taken for public use, without just compensation."

Claims relied, makes this clear, where in dealing with one aspect of the issues there involved, the Court said:

> "We are not now dealing with the right of a State to provide for such liens while property to the chattel in process of construction remains in the builder, who may be constructing the same with a view to transferring title therein to the United States upon its acceptance under a contract with the Government. We are now treating of property which the United States owns. Such property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty against the consent of the Government." 218 U. S., at 471.

The terms of the contract between Rice and the United States show conclusively that Rice, not the United States, had title to the property when petitioners furnished their materials. The agreement provided for delivery, preliminary acceptance, and final acceptance of the boats, the contractor to remain responsible for all supplies until delivery. The contractor was required to insure the property for the Government's benefit only to the extent of progress payments made and materials furnished by the Government. The very clause here invoked by the Government provided that upon default and termination of the contract the Government might "require the Contractor to *transfer* title and *deliver*" the work, supplies and materials on hand. (Emphasis added.) While the Government was obliged to make progress payments based on the percentage of the work completed, nothing in the contract provided that ownership of the portion of the work paid for should vest in the United States. On the contrary, it was stipulated that all progress payments should be secured by a paramount government lien on the property. And finally, the contractor was required to

discharge immediately any lien or right *in rem* asserted against the property. In their totality, these provisions clearly recognize that title was to remain in Rice during performance of the work, and show that private liens could attach to the property while Rice owned it.

We think, therefore, that the Court of Claims was in error in holding as it did. This, however, does not end the case in petitioners' favor since the United States urges other grounds to support its judgment.

## II.

It is contended that petitioners' asserted liens gave them no compensable property interests within the meaning of the Fifth Amendment. Under Maine law, material-men become entitled to a lien when they furnish supplies; however, the lien must subsequently be enforced by attachment of the vessel or supplies. There is no allegation that any of the petitioners had taken steps to attach the uncompleted work. Nevertheless, they were entitled to resort to the specific property for the satisfaction of their claims. That such a right is compensable by virtue of the Fifth Amendment was decided in *Louisville Bank* v. *Radford,* 295 U. S. 555. In that case, a bank acquired a mortgage which under state law constituted a lien enforceable only by suit to foreclose. Subsequently, Congress amended the Bankruptcy Act so as to deprive mort-gagees of substantial incidents of their rights to resort to mortgaged property. This Court held that the bank's property had been taken without just compensation in violation of the Fifth Amendment. No reason has been suggested why the nature of the liens held by petitioners should be regarded as any different, for this purpose, from the interest of the bank held compensable in the *Radford* case.

The Government, however, suggests that because it held a paramount lien on the property to secure its progress

payments, petitioners' claimed liens were in fact worthless. Petitioners, on the other hand, argue that when the Government chose to acquire title to the property rather than to enforce its lien, the lien merged with the title, thus making petitioners' liens paramount, and that even if it did not, and their liens remained subordinate to that of the Government, the value of the hulls and materials would have been sufficient to satisfy the Government's claims and some or all of petitioners' claims as well.

We need not decide whether, as a matter of law, the Government's lien "merged" in its title. At the very least, petitioners, prior to the transfer of title, had the right to whatever proceeds the property might bring over and above the Government's claim to the amount of its progress payments.[2] By the date of default, Rice had expended some $198,000, while the Government had advanced only about $141,000 in progress payments. We have no way of knowing what the property would have brought had it been sold, but it cannot be said with certainty that it would have brought no more than the amount of the Government's claim. Moreover, petitioners themselves might have been able to purchase the property and realize some amount on their claims after the Government's claims had been satisfied. While these factors may present a difficult problem of valuation, we cannot say on this record that petitioners' interests were valueless.[3]

The Government also seems to suggest that because the contract between Rice and the United States expressly

---

[2] While Rice was also liable to the Government for an additional amount approximating $146,000 representing the excess cost to the Government of having the boats completed, the contract does not provide, and there is no allegation, that this amount was secured by a lien on the property.

[3] Questions of value of the liens were not determined by the Court of Claims since it entered a summary judgment for the United States for reasons stated on p. 42, *supra*.

gave the Government the option of requiring a conveyance of title upon default, petitioners' liens attached subject to that limitation. Petitioners, however, were not parties to the contract. Furthermore, their liens attached by operation of law and nothing in the record indicates that the scope of such liens is affected by contractual arrangements into which the owner of the property may have entered.

We conclude, therefore, that on this record petitioners must be considered to have had compensable property interests within the meaning of the Fifth Amendment prior to transfer of title to the Government.

## III.

The final question is whether the Government's action constituted a "taking" of petitioners' property interests within the meaning of the Fifth Amendment. Before the United States compelled Rice to transfer the hulls and all materials held for future use in building the boats, petitioners had valid liens under Maine law against both the hulls and whatever unused materials which petitioners had furnished. Before transfer these liens were enforceable by attachment against both the hulls and all materials. After transfer to the United States the liens were still valid, *United States* v. *Alabama,* 313 U. S. 274, 281–282, but they could not be enforced because of the sovereign immunity of the Government and its property from suit.[4] The result of this was a destruction of all petitioners' property rights under their liens, although, as we have pointed out, the liens were valid and had compensable value. Petitioners contend that destruction of

[4] *United States* v. *Ansonia Brass & Copper Co.,* 218 U. S. 452; *Hill* v. *American Surety Co.,* 200 U. S. 197; *Equitable Surety Co.* v. *McMillan,* 234 U. S. 448; *United States* v. *Munsey Trust Co.,* 332 U. S. 234; *The Siren,* 7 Wall. 152; *Minnesota* v. *United States,* 305 U. S. 382; *United States* v. *Alabama,* 313 U. S. 274.

their liens under the circumstances here is a "taking." The United States denies this, largely on the premise that inability of petitioners to enforce their liens because of immunity of the Government and its property from suit cannot amount to a "taking."

The Government argues that the *Ansonia* case is dispositive of this Fifth Amendment issue. In that case, the contract between the shipbuilder and the United States provided, as to one of the ships contracted for, the dredge *Benyuard,* that as progress payments were made, the portion of the work paid for should become the property of the United States. Subcontractors claimed liens on the uncompleted vessel under the Virginia supply-lien law. This Court merely held that, as the property had passed to the United States by virtue of the terms of the contract, no lien could be enforced against it. No question was raised as to the rights possessed by the subcontractors prior to the acquisition of title by the United States nor as to whether that event entitled them to just compensation under the Fifth Amendment. There is, to be sure, reason to believe that the subcontractors' liens in that case, like those of petitioners here, did attach as soon as materials were furnished, which would necessarily be prior to the making of a progress payment for the portion of the work incorporating those materials and the consequent passage of title to the United States. See *Hawes & Co.* v. *Trigg Co.,* 110 Va. 165, 185–186, 199, 65 S. E. 538, 546–547, 551–552. But the Fifth Amendment question was not raised or passed upon. In these circumstances we cannot regard the court's decision as dispositive on the precise point now under consideration, and must proceed to decide that question.[5]

---

[5] The Government also cites *Mullen Benevolent Corp.* v. *United States,* 290 U. S. 89. The facts there, however, revealed that the Government's action could not have destroyed any liens existing at

We hold that there was a taking of these liens for which just compensation is due under the Fifth Amendment. It is true that not every destruction or injury to property by governmental action has been held to be a "taking" in the constitutional sense. *Omnia Commercial Co.* v. *United States,* 261 U. S. 502, 508–510. This case and many others reveal the difficulty of trying to draw the line between what destructions of property by lawful governmental actions are compensable "takings" and what destructions are "consequential" and therefore not compensable. See, *e. g., United States* v. *Central Eureka Mining Co.,* 357 U. S. 155; *United States* v. *Causby,* 328 U. S. 256; *United States* v. *General Motors Corp.,* 323 U. S. 373; *United States* v. *Sponenbarger,* 308 U. S. 256; *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393; *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467; *Legal Tender Cases,* 12 Wall. 457, 551.

The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment "taking" and is not a mere "consequential incidence" of a valid regulatory measure. Before the liens were destroyed, the lienholders admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done. Since this acquisition was for a public use, however accomplished, whether with an intent and purpose of extinguishing the liens or not, the Government's action did destroy them

---

the time the Government acquired the land because as the Court said, "None remained upon the land, when the purchases were consummated," 290 U. S., at 95.

and in the circumstances of this case did thereby take the property value of those liens within the meaning of the Fifth Amendment. Neither the boats' immunity, after being acquired by the Government, from enforcement of the liens nor the use of a contract to take title relieves the Government from its constitutional obligation to pay just compensation for the value of the liens the petitioners lost and of which loss the Government was the direct, positive beneficiary.

The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. A fair interpretation of this constitutional protection entitles these lienholders to just compensation here. Cf. *Thibodo* v. *United States,* 187 F. 2d 249.

The judgment is reversed and the cause is remanded to the Court of Claims for further proceedings to determine the value of the property taken.

*Reversed and remanded.*

MR. JUSTICE STEWART concurs in the result.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE CLARK join, dissenting.

I agree that petitioners had valid liens on the uncompleted work and supplies at the time the property was transferred to the Government, and that such liens represented compensable property interests within the meaning of the Fifth Amendment. But the Fifth Amendment renders the Government liable only if there was a "taking" by it of such interests. I cannot conclude, as the Court so readily does, that simply because the value of those liens was "destroyed" there was a "taking" of petitioners' property.

As the Court concedes, not every governmental act which ultimately destroys property rights constitutes a compensable taking of those rights. We are not here dealing with a situation in which the United States has condemned the full fee interest in property, thus purporting to extinguish all claims therein. In such a case, it may well be that lienholders are entitled to compensation for the value of their interests. See *Thibodo* v. *United States,* 187 F. 2d 249; cf. *United States* v. *General Motors Corp.,* 323 U. S. 373, 377–378. In this instance, however, the Government has not exercised its power of eminent domain with the intent and purpose of extinguishing petitioners' liens; indeed it has not exercised its power of eminent domain at all. All it has done is to exercise its undoubted power to contract and to acquire title to the property, the consequent effect of which is to render the liens unenforceable because of the independent principle of sovereign immunity. The very nature of the doctrine of sovereign immunity precludes regarding its interposition as a Fifth Amendment "taking." It seems to me that a Court which, having established this immunity, then declares that the Government must pay for exercising it, is effectively negativing it.

I would affirm.