**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**LINDBERG CORPORATION, d/b/a
Harris Metals, Defendant–
Appellant.**

No. 88–2232.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 17, 1989.

Decided Aug. 10, 1989.

Nathan A. Fishbach, Asst. U.S. Atty., Milwaukee, Wis., Rick Richmond, Dept. of Justice, Civil Div., Appellate Staff, John F. Cordes, Jr., Civil Div., Appellate Section, Washington, D.C., for plaintiff-appellee.

Joseph C. Niebler, Niebler & Muren, Brookfield, Wis., for defendant-appellant.

Before EASTERBROOK, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

The United States brought this replevin action to gain possession of certain tank gears in the possession of the defendant Lindberg Corporation (Lindberg). Lindberg counterclaimed for the value of work performed in manufacturing the gears. Rejecting various defenses raised by the defendant, the district court granted summary judgment for the government and ordered Lindberg to relinquish its possession; it also dismissed the defendant's counterclaim for lack of jurisdiction. Lindberg now appeals the district court's grant of summary judgment and its dismissal of the counterclaim. We affirm the judgment of the district court.

## I.

## BACKGROUND

### A. Facts

In March 1983, the United States Army Tank Automotive Command entered into a contract with MTC Gear Corporation (MTC) for the purchase of gears.[1] This government contract provided that the United States would purchase gears for use in military vehicles from MTC at the price of $604 per gear. R. 7 at 2. The contract incorporated Armed Services Procurement Regulation 7–104.35(b) (Procurement Regulation)—"Progress Payments for Small Business Concerns." One of the provisions in that regulation is a title-vesting clause that grants title to the government in all "parts; materials; [and] inventories" allocable or chargeable to the contract upon production or acquisition by MTC. R. 10 at Ex. 5.

In the course of performing its work under the contract, MTC arranged for the gears to be heat "treated" or "enhanced" by Lindberg. This process was necessary to meet the specifications of the government contract. Thus, the unfinished gears were shipped from MTC to Lindberg, which, through its Harris Metals division, performed the treatment procedure. No formal subcontract was drawn up between MTC and Lindberg; MTC simply sent the gears, along with purchase orders explaining the proper specifications, to Lindberg for treatment.[2] Lindberg performed work on MTC-manufactured gears from April through October 1983.

In November, MTC closed active business and became insolvent. R.16A. At that time, MTC owed Lindberg $224,424.06 for its work; it also owed the government a substantial amount of money because, prior to MTC's going out of business, the government had advanced $945,340 in progress payments. The government later recovered all but $273,420.20. MTC's insolvency prompted both the government and Lindberg to seek some form of repayment.

Lindberg acted first. In May 1984, Lindberg filed suit in the Circuit Court for Racine County, Wisconsin against MTC and the Chase Commercial Corporation (Chase).[3] It sought foreclosure of a common-law bailment lien against the gears for the value of the heat treatment performed by Lindberg. On July 25, 1984, the circuit court granted Lindberg a final default judgment foreclosing the lien. R. 7 at Ex. 1. At about this same time, the government, after having recovered as much of the cash progress payments as it could, took its first steps toward repossessing the gears. In December 1984, the government notified Lindberg of the government's title to the gears and demanded that Lindberg relinquish possession.[4] Lindberg refused. Instead, in March 1985, Lindberg arranged a private foreclosure judgment sale of the gears to the Profile Gear Corporation (Profile) for $70,225. Notice of the private sale was provided to MTC, Chase, and the government. Upon receiving this notice, the government informed Profile of its claim of ownership, after which Profile refused to consummate the transaction.

On May 3, 1985, the government filed this replevin action seeking possession of the gears. Lindberg answered and filed an amended counterclaim, asserting that its common-law bailment lien was "superior to plaintiff's claim of title." R. 17 at 2, ¶ 7. Both parties moved for summary judgment.

### B. Holding of the District Court

In two separate rulings, reported together as *United States v. Lindberg Corp.,* 686

---

1. The specific type of gears in Lindberg's possession was described as "BullGears, Part No. 7364141." R. 10 at Ex. 3.

2. On its purchase orders, MTC requested that Lindberg perform the following treatment on the unfinished gears:
   CARBURIZE, GLEASON HARDEN, TEMPER INDUCTION, TEMPER BORE, CLEAN AND 100% MAGNETIC PARTICLE INSPECTION PER MIL–I–6868 AND CLEAN

R. 10 at Ex. 1.

3. The Chase Commercial Corporation was the only party that had filed a financing statement covering the gears.

4. According to Lindberg, this letter was the first notice that it had "received of any claim of title to the aforesaid gears by the United States Government." R. 10 at 2, ¶ 5 (affidavit of Steven Pegg).

F.Supp. 701 (E.D.Wis.1988), the district court granted summary judgment for the government. In its view, the government had title to the gears through operation of the title-vesting clause in the contract. 686 F.Supp. at 702–03. That title, continued the district court, was not lost upon the gears' being sent to Lindberg for heat treatment. Title to the property is "not tied directly to the progress payments." *Id.* at 703. Furthermore, it held, "[u]nder federal law, laborers and materialmen can acquire no liens on a public work without the consent of the United States." *Id.* at 707 (citing *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *In Re Murdock Mach. & Eng'g Co.,* 620 F.2d 767, 769–70 (10th Cir.1980)). Consequently, Lindberg's state-law based bailment lien could not be valid against the United States. 686 F.Supp. at 707. Nor, continued the court, can the state lien support a claim for recoupment or for the defenses of estoppel, waiver, and laches. With respect to Lindberg's counterclaim, the district court held that it was without jurisdiction because the amount in controversy exceeded the statutory limitation. *See* 28 U.S.C. § 1346(a)(2).[5]

## II.

## ANALYSIS

### A. *Government's Claim: Possession of the Gears*

#### 1. Title in the finished gears

■ At this point in the litigation, there appears to be no dispute between the par-

ties with respect to the ownership of the gears prior to their shipment to Lindberg. By virtue of the government procurement contract between the United States and MTC, title clearly was vested in the United States. Nevertheless, Lindberg submits that title to the enhancement of the gears is vested in Lindberg. In a nutshell, Lindberg argues that, although the government may have had title in the unfinished gears shipped from MTC to Lindberg, it does not have title in the heat treatment performed on the gears. It submits that, since the government did not make progress payments to MTC specifically directed at paying for the heat treatment, and, since neither MTC nor the government ever had possession of the heat-treated gears, the government never obtained title in the treatment of the gears. Appellant's Br. at 13–18. Lindberg notes that it never received any payment from MTC. It then submits that, assuming the government followed its own regulations, "whatever progress payments were made by the Government to MTC did not include work which Lindberg performed. If the Government did not pay for the enhancement, and neither MTC nor the Government ever took possession of the enhancement, the title to the enhancement of the Gears never passed to the Government." Appellant's Br. at 17. Lindberg argues that MTC received progress payments from the government, but under Procurement Regulation paragraphs (a)(1) and (j),[6] it ought not have made those payments unless MTC paid Lindberg's invoices in advance or after approval by the government.

. . . .

(j) Progress Payments to Subcontractors.
(1) The amount mentioned in item (a)(1)(ii) above shall be the sum of (i) *all the progress payments made by the Contractor to his subcontractors and remaining unliquidated,* and (ii) *unpaid billings for progress payments to subcontractors which have been approved for current payment in the ordinary course of business,* when under subcontracts which conform to (2) below.
(2) Subcontracts on which progress payments to subcontractors may be included in the base for progress payments pursuant to paragraph (a) of this clause are limited to those subcontracts in which there is expected to be a long "lead time", between the begin-

---

**5.** The district courts have jurisdiction, concurrent with the United States Claims Court, of civil actions or claims "against the United States, *not exceeding $10,000 in amount,* founded either upon the Constitution, or any Act of Congress." 28 U.S.C. § 1346(a)(2) (emphasis supplied).

**6.** Those provisions state in relevant part that: (a) ... (1) Unless a smaller amount is requested, each progress payment shall be (i) ninety-five percent (95%) ... of the amount of the Contractor's total costs incurred under this contract, except as provided herein with respect to costs of pension contributions, plus (ii) *the amount of progress payments to subcontractors as provided in (j) below;* ...

We cannot accept this argument. The contract between MTC and the government explicitly provided that:

> (d) Title. Immediately upon the date of this contract, title to all parts; materials; inventories; work in process; ...; *theretofore acquired or produced by the Contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the government;* and title to all like property *thereafter acquired or chargeable to this contract* as aforesaid *shall forthwith vest in the Government upon said acquisition, production, or allocation.*

Procurement Regulation ¶ (d) (emphasis supplied). The contract also provided, in relevant part, that:

> All rights of the subcontractor with respect to *all property to which the Government has title* under the subcontract *will be made subordinate to the rights of the Government* to require delivery of such property to it *in the event*

> ning of work and the first delivery, approximating four months or more for small business concerns and six months or more for firms which are not small business concerns, and in which the provisions regarding progress payments are substantially similar to and as favorable to the Government as this "Progress Payments" clause (except that in the case of those subcontractors which are small business concerns a "Progress Payment" clause substantially similar to 7–104.35(b) may be used). Progress payment rates for subcontractors shall be either the uniform, standard progress payment rate under Appendix E–503 or (if the subcontractor qualifies under Appendix E–530.3) the flexible progress payment rate under Appendix E–530, at the election of the subcontractor. *All rights of the subcontractor with respect to all property to which the Government has title under the subcontract will be made subordinate to the rights of the Government to require delivery of such property to it in the event of default by the Contractor under this contract or in the event of the bankruptcy or insolvency of the subcontractor.*
>
> (3) The Government agrees that any proceeds received by it from property to which it has acquired title by virtue of such provisions in any subcontract shall be applied to reduce the amount of unliquidated progress payments made by the Government to the Contractor under this contract. In the event the

*of default by the Contractor under this contract* or in the event of the bankruptcy or insolvency of the subcontractor.

Procurement Regulation ¶ (j)(2) (emphasis supplied).

When these provisions are given their plain meaning and are read in the context of the entire regulation, it is clear that title to the heat-treated gears—gears allocable to the MTC-government contract—is vested in the government. MTC entered into this contract to manufacture gears for the government; Lindberg was clearly a subcontractor to this arrangement.[7] Paragraph (d) of the Procurement Regulation, the key subsection, grants title in the unfinished gears to the government. No provision of the regulation supports the proposition that the heat treating of the gears altered this title. Moreover, under the provisions, there simply is no linkage between the government's right to title and the making of progress payments to the subcontractor. The payment provisions nowhere qualify the government's title in ma-

> Contractor fully liquidates such progress payments made by the Government to him hereunder and there are progress payments to any subcontractors which are unliquidated, the Contractor shall be subrogated to all the Government's rights by virtue of such provisions in the subcontract or subcontracts involved as if all such rights had been thereupon assigned and transferred to the Contractor.
>
> (4) The billing described in (j)(1)(ii) above shall be paid promptly by the Contractor in the ordinary course of business, not later than a reasonable time after payment of equivalent amounts by the Government to the Contractor.
>
> (5) To facilitate small business participation in subcontracting under this contract, *the Contractor agrees to offer and provide progress payments to those subcontractors which are small business concerns, in conformity with the standards for customary progress payments stated in Appendix E of the Defense Acquisition Regulation,* as in effect on the date of this contract. The Contractor further agrees that the need for such progress payments will not be considered as a handicap or adverse factor in the award of subcontracts.

R. 10 at Ex. 5 (footnote omitted) (emphasis supplied by appellant).

---

7. *See* Appellant's Br. at 17 ("Lindberg was clearly a subcontractor of MTC....").

terial allocable to the contract. *See In re American Boiler Works, Inc.,* 220 F.2d 319, 321 (3d Cir.1955) ("But one does not need a citation of decided cases to understand the language ... of the contract between the parties. It is as clear as English words can make it. The title, both as to the vessels and to materials, vested in the government with no ifs, ands or buts. *And without any mention of payment as a prerequisite thereto.*") (emphasis supplied). *Compare In re Read-York, Inc.,* 152 F.2d 313, 316 (7th Cir.1945) (language of World War II procurement contract clearly tied progress payments to title vesting). Accordingly, upon the "event of default by [MTC] under this contract," Procurement Regulation ¶ (j)(2), Lindberg was required to deliver the heat-treated gears to the government. The district court did not err.

### 2. Attachment of the Bailment Lien

■ Lindberg next submits that it held a valid bailment lien that precluded granting summary judgment for the government in its replevin action.

Under Wisconsin law, Lindberg well may have obtained a valid judgment foreclosing its bailment lien against MTC.[8] However, Lindberg's satisfying state-law prerequisites for a bailment lien cannot end our inquiry. As the Supreme Court recently noted in *Boyle v. United Technologies,* ── U.S. ──, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988), "obligations to and rights of the United States under its contracts are governed exclusively by federal law." Here, the federal military procurement contract, with its provision vesting ownership in the federal government from the very beginning of the manufacturing process, clearly constitutes a federal policy that cannot tolerate the concomitant operation of the state's bailment lien foreclosure. *See Boyle,* 108 S.Ct. at 2515. "[L]aborers and materialmen can acquire no liens on a 'public work.'" *Armstrong v. United States,*

364 U.S. 40, 42, 80 S.Ct. 1563, 1565, 4 L.Ed.2d 1554 (1960) (quoting *Hill v. American Surety Co.,* 200 U.S. 197, 203, 26 S.Ct. 168, 50 L.Ed. 437 (1906)). "'We are now treating of property which the United States owns. Such property, for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty against the consent of the Government.'" *Armstrong,* 364 U.S. at 43, 80 S.Ct. at 1565–66 (quoting *United States v. Ansonia Brass & Copper Co.,* 218 U.S. 452, 471, 31 S.Ct. 49, 54, 54 L.Ed. 1107 (1910)); *see also In re American Pouch Foods, Inc.,* 769 F.2d 1190 (7th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986). Accordingly, we agree with the district court that "the government obtained vested title in the gears prior to heat treatment of them by Lindberg. Thus, the lien on the government's property acquired by Lindberg subsequent to the vesting of title cannot be valid against the government." 686 F.Supp. at 707 (citation omitted).

Nor do we believe that Lindberg can avoid the supremacy of federal law by characterizing its claim as one for recoupment. *See* Fed.R.Civ.P. 13. Recoupment is merely "'the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very [matter] giving rise to the plaintiff's claim.'" *United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1490 (10th Cir. 1984) (quoting *First Nat'l Bank v. Master Auto Serv. Corp.,* 693 F.2d 308, 310 n. 1 (4th Cir.1982)). Federal Rule of Civil Procedure 13(d) specifically requires that "[t]hese rules [including the right of counterclaim] shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof.". As we have already noted, it is well established that a state-law based lien cannot, absent the con-

---

8. *See Moynihan Assocs., Inc. v. Hanisch,* 56 Wis.2d 185, 201 N.W.2d 534, 536–37 (1972) (listing the three prerequisites to a bailment lien as: (1) existence of an agreement to redeliver the property; (2) possession of the chattel tempo-rarily transferred while general title of the chattel remains in the hands of the original owner; and (3) general titleholder out of possession of the chattel and the bailee in a position to exercise possessory rights).

sent of the United States, operate to impair the previously acquired property rights of the United States. In any event, the prerequisites for recoupment simply are not present here.[9] The counterclaim does not arise from the same transaction or occurrence as the replevin action. The counterclaim is based upon Lindberg's heat treatment of the gears; the government's claim is based on its original procurement contract with MTC. Secondly, the relief sought in the recoupment is substantially different from that sought by the government. Lindberg seeks monetary payment for its work; the government wants possession of its gears. Accordingly, recoupment is not available to Lindberg.

### 3. Equitable defenses

The appellant finally submits that such extreme unfairness exists in this case that equity bars the government's replevin action. Specifically, Lindberg notes that it (1) performed all the heat treating requested by MTC, (2) knew nothing about the MTC-government contract, and (3) upon learning of MTC's insolvency, sought and obtained a proper bailment lien in state court. By contrast, Lindberg submits, the government never filed public notice of its title in the gears and did not notify Lindberg of its interest in the gears until the eve of the private foreclosure sale. *See* Appellant's Br. at 19–23. Thus, the appellant submits that the government ought to be prevented from suing for replevin by the doctrines of estoppel and laches.[10]

■ We do not believe that either of these equitable concepts affords a basis for relief. In *Woodstock/Kenosha Health Center v. Schweiker*, 713 F.2d 285 (7th Cir.1983), this court had occasion to discuss the application of estoppel and laches against the government. Estoppel against the government, the court said, has been recognized only in "certain narrow circumstances." 713 F.2d at 290. *See generally Heckler v. Community Health Servs.*, 467 U.S. 51, 59–61, 104 S.Ct. 2218, 2223–24, 81 L.Ed.2d 42 (1984). As factors to consider in determining the existence of those exceptional circumstances, the court noted that:

> " 'First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury.' "

*Woodstock/Kenosha Health Center*, 713 F.2d at 290 (quoting *Portmann v. United States*, 674 F.2d 1155, 1167 (7th Cir.1982) (reversing a district court holding that estoppel could not apply as a matter of law against the government) (quoting *TRW, Inc. v. FTC*, 647 F.2d 942, 950–51 (9th Cir.1981) (citations omitted))). Here, we are not confronted with a trail of false "promises, misrepresentations, or misleading silences." *Citizens Marine Nat'l Bank v. United States Dep't of Commerce*, 854 F.2d 223, 229 (7th Cir.1988). The record does not establish that the government knew that MTC would employ any subcontractors, or that it ever intended to mislead subcontractors about its title in all "parts; materials; inventories; [and] work in process" allocable to the contract. *See* Procurement Regulation ¶ (d). The government was under no obligation to file public notice of its contract with MTC. Nor can Lindberg be characterized as an unsophisticated victim. It undertook to

**9.** *See* 6 C. Wright & A. Miller, Federal Practice and Procedure § 1427 (1971 & Supp.1988) (for court to entertain counterclaim against government, (1) the counterclaim must arise out of the same transaction or occurrence and (2) the relief must neither exceed nor differ in kind from that sought by the sovereign).

**10.** In its answer to the government's complaint, Lindberg also pleaded waiver as an affirmative defense, *see* R. 2 at 3, and, in passing, mentions waiver in its appellate brief, *see* Appellant's Br. at 21, but does not press that argument on appeal. *See Beard v. Whitley County REMC,* 840 F.2d 405, 408–09 (7th Cir.1988) (appellant must not only present issues, but also support with appropriate authority).

work as a subcontractor on a project requiring adherence to military specifications. It cannot now charge the government with overreaching. *See Woodstock/Kenosha Health Center*, 713 F.2d at 291.

Similarly, Lindberg cannot resort to the equitable defense of laches. Regarding the application of laches against the government, this court has stated that "[l]aches bars the assertion of a claim 'where deferment of action to enforce claimed rights is prolonged and inexcusable and operates to ... [a party's] material prejudice.'" *Id.* (quoting *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479 (7th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975)). The record fails to present any grounds for invoking this equitable defense. Upon learning of MTC's default on the contract, the government first attempted to recover as much of its progress payments as possible. After exhausting these avenues, it turned to the gears in Lindberg's possession and sought recovery. We cannot say that the thirteen-month period between MTC's default and the commencement of the government's actions constituted an inexcusable delay. *Cf.* 28 U.S.C. § 2415(c) (no time limit for government to "bring an action to establish the title to, or right of possession of, real or personal property"); Wis.Stat.Ann. § 402.725 (six-year statute of limitations for commercial buyer's replevin action).

The district court properly rejected the equitable defenses of estoppel and laches as bars to the government's right to possess the gears. The record does not support the appellant's contentions that the government acted in so unfair a manner as to prevent it from gaining possession to the property in which it holds vested title. Although a court may, under some circumstances, "apply equitable principles against the government in a case where extreme unfairness [is] shown," those circumstances have not been established here. *American Pouch*, 769 F.2d at 1197.

### B. *Lindberg's Counterclaim: Compensation for the Heat Treating*

The appellant also filed a counterclaim seeking compensation for the heat treatment performed on the gears, and now submits that the district court erred in dismissing that counterclaim for the unpaid heat treatment that Lindberg performed on the gears—$224,424.06.

We cannot reach the merits of this counterclaim, because, as the district court noted, it lacked jurisdiction to hear a claim against the United States for an amount greater than $10,000. *See* 28 U.S.C. § 1346(a)(2). The appellant's breaking down the total amount to a less-than-$10,000 amount-per-gear is untenable. Any claim that Lindberg seeks to bring against the federal government must be brought in the United States Claims Court. *See* 28 U.S.C. § 1491; *see also Marozsan v. United States*, 852 F.2d 1469, 1471 n. 3 (7th Cir.1988) (en banc).

### CONCLUSION

Under the title-vesting clause of the government contract, the government held title to the gears both before and after Lindberg performed the heat treatment. Accordingly, the government is entitled to possession of the gears. Lindberg's state-law bailment lien on the gears does not affect the government's right to possession. The district court correctly held that it had no jurisdiction over the counterclaim. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.