**NATIONAL MICROGRAPHICS SYSTEMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–193C.**

United States Court of Federal Claims.

May 30, 1997.

David S. De Jong, with whom was Jeffrey M. Schwaber, Rockville, MD, for plaintiff.

Todd M. Hughes, Civil Division, U.S. Department of Justice, Washington, DC, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Joseph A. Kijewski, for defendant.

## OPINION

MARGOLIS, Judge.

This government contracts case involves plaintiff's effort to secure payment for a computer system that was delivered by plaintiff to the National Security Agency ("NSA") facility at Fort George Meade, Maryland.

Plaintiff has asserted claims for a breach of contract and for a taking in violation of the Fifth Amendment. The case is currently before the court on defendant's motion to dismiss for lack of jurisdiction, or in the alternative for failure to state a claim upon which relief can be granted. Defendant first argues that this court lacks jurisdiction over plaintiff's claim and/or plaintiff has failed to state a claim upon which relief can be granted because there is no privity of contract between plaintiff, a subcontractor, and the government. Defendant also argues that plaintiff has failed to state a Fifth Amendment takings claim because plaintiff did not possess a legally-cognizable property interest in the computer system. After considering the record and oral arguments, the court agrees with the government that plaintiff has failed to state a claim for either breach of an implied-in-fact contract or a Fifth Amendment taking.

## FACTS

The present controversy grew out of a contract between the United States, acting through the National Security Agency, and Minigraph, Inc. ("Minigraph"), a Delaware corporation doing business in the State of Maryland.[1] On October 1, 1992, the NSA and Minigraph entered into a time and materials type contract, Contract No. MDA904–93–C–B001, which called for Minigraph to perform certain engineering and technical support services at the NSA facility at Fort George Meade, Maryland. Because the NSA–Minigraph contract was structured as a time and materials type contract,[2] Minigraph was required to "furnish the necessary materials, facilities, equipment and the services of skilled professional engineering and technical

personnel to perform the requirements set forth in the Statement of Work for CALS Engineering Service Support." The contract specified that, pursuant to the requirements of FAR 16.601, Minigraph would be reimbursed, at cost, for any necessary materials. The contract further specified, by incorporating FAR 52.245–5(c)(2), that "[t]itle to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under this contract shall pass to and vest in the Government upon the vendor's delivery of such property."

In July 1995, Minigraph entered into a separate subcontract with plaintiff, National Micrographics Systems, Inc. ("NMS" or "plaintiff"), to provide a computer system that would be delivered by plaintiff directly to the NSA's facility at Fort Meade. Under this arrangement, however, plaintiff would not be paid by the NSA. Instead, plaintiff was to receive payment for the computer system from Minigraph, the prime contractor. Under the terms of the prime contract, the NSA would reimburse Minigraph for the cost of the computer. *See* FAR 16.601.

On July 28, 1995, plaintiff delivered the computer system to the NSA facility at Fort Meade. At the time of delivery, the computer system was accompanied by a standard form which bore the National Micrographics Systems, Inc. logo and was entitled "DELIVERY TICKET." In addition to a description of the merchandise delivered,[3] the delivery ticket contained spaces marked "SHIPPED FROM" "SHIPPED TO" and "BILL TO." The completed delivery ticket showed that the merchandise was "SHIPPED FROM" the subcontractor, plaintiff National Micrographics; was "SHIPPED TO" defendant,

1. The Minigraph–NSA contract ("the prime contract"), is not directly at issue in this case, nor is Minigraph a party to this case.

2. Section 16.601 of the Federal Acquisition Regulation ("FAR") defines a time and materials type contract as one which "provides for acquiring supplies or services on the basis of (1) direct labor hours at specified fixed hourly rates that include wages, overhead, general and administrative expenses, and profit and (2) materials at cost, including, if appropriate, material handling costs as part of material costs." FAR 16.601(a). According to the FAR, the government may em-

ploy time and materials type contracts "when it is not possible at the time of placing the contract to estimate accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence." FAR 16.601(b).

3. The delivery ticket shows that National Micrographics delivered the following merchandise to the NSA on July 28, 1995: one RP609Z main unit; one automatic card feeder; two cases premium bond paper; one starter toner; one toner; and one 150 watt lamp.

the NSA, at Fort Meade; and was "BILLED TO" the prime contractor, Minigraph. The delivery ticket was signed and dated by Bill Byers, an employee of the NSA, in a space marked "RECEIVED BY."

The delivery ticket also included the following language, which is pivotal to the present dispute:

NATIONAL MICROGRAPHICS RESERVES TITLE TO THE MATERIAL SOLD HEREUNDER AS SECURED FOR PERFORMANCE OF CUSTOMER'S OBLIGATION. SHOULD CUSTOMER FAIL TO PERFORM ANY PROVISIONS OF THIS AGREEMENT BY IT TO BE PERFORMED OR DEFAULT IN PAYMENT OF ANY CHARGES HEREUNDER WHEN DUE, NATIONAL MICROGRAPHICS SYSTEMS MAY REMOVE AND REPOSSESS ANY OR ALL MATERIAL HEREUNDER WITH OR WITHOUT NOTICE OR DEMAND, IN ADDITION EXERCISING SUCH OTHER RIGHTS AND REMEDIES AS MAY BE CONFERRED ON IT BY LAW.

Complaint at Exhibit 1.

On July 28, 1995, the same date that plaintiff delivered the computer system to the NSA, plaintiff also forwarded an invoice for the computer system to Minigraph. In addition to a description of the merchandise being billed,[4] the invoice, like the delivery ticket, contained spaces marked "BILL TO" and "SHIP TO." Like the delivery ticket, the invoice indicated that the computer system was shipped to the NSA at Fort Meade, and was billed to Minigraph. According to the invoice, the total price for the delivered computer system was $25,965.23, payable to NMS in 30 days.

The parties agree that, some time after July 1995, the NSA prepared a check to pay Minigraph, in full, for the computer system. However, before Minigraph could pay plaintiff for the computer system, the check from the NSA to Minigraph was apparently intercepted by the Internal Revenue Service ("IRS") to satisfy a delinquent tax lien against Minigraph. As a result, Minigraph never paid plaintiff the money plaintiff was owed—$25,965.23—for the computer system that plaintiff had delivered to the NSA on July 28, 1995. Unable to obtain payment from the prime contractor Minigraph,[5] plaintiff sent a letter to the NSA's contracting officer demanding return of the computer system or payment in full of the unpaid balance due on the delivered computer system, $25,965.23. After the NSA refused to pay for or return the computer, plaintiff filed suit in this court, alleging a breach of contract and/or an unconstitutional taking. Plaintiff is seeking a judgment against the United States in the amount of $25,965.23, or return of the computer system.

## DISCUSSION

■ The government has moved to dismiss plaintiff's complaint on two grounds— lack of subject matter jurisdiction under RCFC 12(b)(1), and/or failure to state a claim upon which relief can be granted under RCFC 12(b)(4). In evaluating a challenge to jurisdiction under Rule 12(b)(1), this court must look no further than the allegations contained in the complaint to determine whether plaintiff's claims fall within the court's Tucker Act jurisdiction. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997) ("A well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction."). By contrast, in evaluating a motion to dismiss under 12(b)(4), the court must consider the merits of plaintiff's claims, and may only dismiss the complaint when "it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

---

4. Like the delivery ticket, plaintiff's invoice shows that Minigraph was billed for the following equipment and supplies that had been shipped to NSA by plaintiff: one RP609Z main unit; one automatic card feeder; two cases premium bond paper; one starter toner; one toner; and one 150 watt lamp.

5. Plaintiff alleges, on information and belief, that Minigraph is now insolvent.

█ Plaintiff in this case has advanced two theories of recovery—breach of an implied contract, and an unconstitutional taking. Plaintiff first alleges that, by signing the delivery ticket that accompanied the computer, the NSA entered into an implied-in-fact contract with plaintiff which obligated the NSA to pay for or return the computer system in the event that plaintiff did not receive full payment for the computer. Plaintiff argues that, by refusing to pay for or return the computer, the government has breached the parties' implied-in-fact contract. Alternatively, plaintiff alleges that, under the terms of the delivery ticket, plaintiff retained a security interest in the computer system that it delivered to the NSA. By refusing to pay for or return the computer system, plaintiff argues, the government has effected a taking of plaintiff's security interest in the computer for which plaintiff is entitled to just compensation.

After reviewing the allegations contained in the complaint, the court concludes that both of plaintiff's claims fall squarely within this court's jurisdiction. The jurisdiction of this court is defined in the Tucker Act, 28 U.S.C. § 1491, which provides in part that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution or . . . upon any express or implied contract with the United States." It is well-settled that, under the Tucker Act, this court possesses jurisdiction to consider claims for breach of an implied-in-fact contract with the government. *See e.g., Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed.Cir.1995). Similarly, the Tucker Act vests this court with jurisdiction over claims for just compensation under the Fifth amendment. *Narramore v. United States*, 960 F.2d 1048, 1051 (Fed.Cir.1992) (citing *Preseault v. ICC*, 494 U.S. 1, 11–13, 110 S.Ct. 914, 921–23, 108 L.Ed.2d 1 (1990)). There-

fore, defendant's Rule 12(b)(1) motion to dismiss for lack of jurisdiction must be denied.

█ Even though plaintiff's claims fall within the jurisdiction of this court, the Court's inquiry is not at an end. Defendant has also moved for dismissal of the complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(4). Once again, dismissal under Rule 12(b)(4) is appropriate only when "it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Hamlet*, 873 F.2d at 1416. In evaluating a motion to dismiss under Rule 12(b)(4), the allegations of the complaint should be construed in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Applying these standards to the allegations in this case, the court concludes that plaintiff has failed to state a claim upon which relief can be granted for either a breach of an implied-in-fact contract, or for a Fifth Amendment taking of property.

### 1. Implied–in–Fact Contract Claim

█ Plaintiff has alleged that, by accepting delivery of the computer and signing the accompanying delivery document, the NSA entered into an implied-in-fact contract with National Micrographics, and thereby agreed to be bound by the terms set forth in the delivery ticket. Plaintiff argues that, under the terms of this implied-in-fact contract, the NSA explicitly recognized plaintiff's right to repossess the computer in the event that plaintiff did not receive payment. According to plaintiff, the NSA breached this alleged implied-in-fact contract by refusing to pay for or return the computer system when plaintiff did not receive payment from the prime contractor, Minigraph.[6]

█ The elements of an implied-in-fact contract are nearly identical to the elements of an express contract; only the nature of the proof is different. *Russell Corp. v. Unit-*

---

6. Plaintiff's breach of contract claim is not founded on the contract between the NSA and Minigraph. Indeed, as a subcontractor to the NSA–Minigraph contract, plaintiff is not in privity of contract with the government and therefore cannot assert a claim based on the NSA–Minigraph contract. *See United States v. Johnson Controls*, 713 F.2d 1541, 1550 (Fed.Cir.1983).

Thus, " 'unless the plaintiff can provide evidence of the existence of some type contract between it and the United States, it cannot, as a subcontractor, recover directly from the United States for amounts owed to it by the prime [contractor].' " *Id.* (quoting *Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 479 F.2d 1334, 1337 (1973)).

*ed States,* 210 Ct.Cl. 596, 609, 537 F.2d 474 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Thus, in order to establish the existence of an implied-in-fact contract, plaintiff must demonstrate (1) an unambiguous offer, (2) an unambiguous acceptance, (3) a mutual intent to be bound, and (4) consideration. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir. 1990), *cert denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *see also H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). In addition to these basic contract elements, plaintiff must also establish that the officer whose conduct gave rise to the contract had actual authority to bind the United States. *City of El Centro,* 922 F.2d at 820; *H.F. Allen Orchards,* 749 F.2d at 1575.

 Even assuming, *arguendo,* that plaintiff can establish that there was an unambiguous offer, an unambiguous acceptance, a mutual intent to be bound, and action by an individual with authority to bind the government, plaintiff's claim that National Micrographics entered into an implied-in-fact contract with the NSA must nevertheless fail for lack of consideration. "Contracts with the Government, like all contracts, require . . . consideration." *Allen v. United States,* 100 F.3d 133, 134 (Fed.Cir.1996) (citations omitted). Generally, "[c]onsideration is sufficient if there is any benefit to the promisor or any detriment to the promisee." *Nebco & Assocs. v. United States,* 23 Cl.Ct. 635, 645 (1991) (citing Restatement (Second) of Contracts §§ 71, 332(5)); *see also Estate of Bogley v. United States,* 206 Ct.Cl. 695, 514 F.2d 1027, 1033 (1975). However, "[c]onsideration, in the context of a government contract, must render a benefit to the government, and not merely a detriment to the contractor." *Montefiore Hospital Ass'n v. United States,* 5 Cl.Ct. 471, 476 (1984) (citing *Vulcanite Portland Cement Co. v. United States,* 74 Ct.Cl. 692, 705, 1931 WL 2351 (1931)). Moreover, it is well-settled that "[p]erformance of a pre-existing legal duty is not consideration." *Allen,* 100 F.3d at 134; *see also Aviation Contractor Employees, Inc. v. United States,* 945 F.2d 1568, 1574 (Fed. Cir.1991).

In this case, plaintiffs delivery of the computer to the NSA cannot be considered valid consideration. By plaintiffs own admission, National Micrographics was contractually obligated under its subcontract with Minigraph to deliver the computer system to the NSA. Therefore, plaintiff did not suffer any added legal detriment in delivering the computer to the NSA. More importantly, however, the NSA was entitled, under its time and materials type contract with Minigraph, to receive the computer system that plaintiff delivered. Therefore, the NSA did not receive any added benefit in exchange for its purported agreement to be bound by the terms of the delivery ticket. Absent sufficient consideration, plaintiff cannot prove the existence of an implied-in-fact contract. *Allen,* 100 F.3d at 134; *Aviation Contractor Employees,* 945 F.2d at 1574. Consequently, plaintiff's breach of contract claim must be dismissed for failure to state a claim upon which relief can be granted.

### 2. Fifth Amendment Takings Claim

 Plaintiff has also asserted a claim for just compensation under the Fifth Amendment to the Constitution. In order to successfully bring a Fifth Amendment claim, plaintiff must first demonstrate the existence of a "legally-cognizable property interest." *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir.1993). In this case, plaintiff argues that under Maryland law, National Micrographics' attempt to reserve title to the computer, through the language in the delivery ticket, created a valid and enforceable security interest and lien in the computer system in favor of plaintiff. In support of this argument, plaintiff relies principally on *Tilghman Hardware, Inc. v. Larrimore,* 331 Md. 390, 628 A.2d 215, 218 (1993), where the Maryland Court of Appeals held that, under Maryland law, an enforceable security interest "can be created by manifesting the intent to do so through language referring to delivery of possession with a reservation of title to be delivered upon satisfaction of a condition." According to plaintiff, the NSA's retention of the computer system and its refusal to pay are tantamount to a taking of plaintiff's alleged securi-

ty interest and lien in the computer system, for which plaintiff is entitled to just compensation.

Plaintiff's argument that National Micrographics reserved a security interest in the computer system that plaintiff delivered to the NSA on July 28, 1995, however, is directly at odds with the great weight of authority refusing to enforce state liens against property owned by the United States. *See Armstrong v. United States,* 364 U.S. 40, 42, 80 S.Ct. 1563, 1565, 4 L.Ed.2d 1554 (1960) (recognizing the premise that "laborers and materialmen can acquire no liens on a 'public work.'"); *United States v, Ansonia Brass & Copper Co.,* 218 U.S. 452, 471, 31 S.Ct. 49, 54, 54 L.Ed. 1107 (1910) ("In any event, it could not be tolerated that property of the United States could be seized or encumbered under state lien laws of the character in question."); *see also Marine Midland Bank v. United States,* 231 Ct.Cl. 496, 687 F.2d 395, 398 (1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983) ("It is also indisputable that the government's taking of possession put the collateral beyond the reach of any interest that plaintiff may have had."); *Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 655 F.2d 1047, 1057 (1981) (holding that attempt by construction company to assert a mechanic's lien against government-owned housing project "ignore[d] the long-settled rule that [such] liens ... are not enforceable against the United States or its property"). According to the *Armstrong* Court, this general rule that state liens cannot be asserted against federal property is a function of sovereign immunity, for "'property [that is owned by the United States], for the most obvious reasons of public policy, cannot be seized by authority of another sovereignty against the consent of the [United States] Government.'" 364 U.S. at 43, 80 S.Ct. at 1566 (quoting *Ansonia Brass & Copper Co,* 218 U.S. at 471, 31 S.Ct. at 54).

In the case before us, the express terms of the prime contract between the NSA and Minigraph provided that title to the computer would vest in the United States upon delivery of the computer by the vendor, National Micrographics. Specifically, FAR 52.245–5(c)(2), which was incorporated into the NSA–Minigraph prime contract, stated that "[t]itle to all property purchased by the Contractor for which the Contractor is entitled to be reimbursed as a direct item of cost under the contract *shall pass to and vest in the Government upon the vendor's delivery of such property.*" FAR 52.245–5(c)(2) (emphasis added). Because title to the computer system vested in the United States when plaintiff delivered the computer to the NSA, plaintiff's effort to reserve a security interest in the computer, at the same time that plaintiff delivered the computer to the government, was ineffective as a matter of law. *See Armstrong,* 364 U.S. at 42, 80 S.Ct. at 1565; *Marine Midland,* 687 F.2d at 398; *Aetna Casualty & Surety,* 655 F.2d at 1057. Consequently, plaintiff has not demonstrated the existence of a legally-cognizable property interest that would permit plaintiff to successfully assert a Fifth Amendment claim.

A similar conclusion was reached in *United States v. Lindberg Corp.,* 882 F.2d 1158, 1162 (7th Cir.1989), *aff'g* 686 F.Supp. 701 (E.D.Wis.1987), where the Court of Appeals for the Seventh Circuit affirmed a decision by the district court rejecting a subcontractor's effort to assert a lien against property owned by the United States. The property at dispute in *Lindberg,* certain mechanical gears, had been delivered by the prime contractor to the subcontractor, Lindberg, to undergo heat treatment. 882 F.2d at 1159. The Court of Appeals upheld the lower courts' conclusion that, under the terms of the prime contract, "'the government obtained vested title to the gears prior to the heat treatment of them by Lindberg. Thus, the lien on the government's property acquired by Lindberg subsequent to the vesting of title [in the United States] cannot be valid against the federal government.'" *Id.* at 1162 (quoting *United States v. Lindberg Corp.,* 686 F.Supp. at 707). In rejecting the subcontractor's efforts to assert a lien against the federal government, the *Lindberg* court reasoned that "[h]ere, the federal military procurement contract, with its provisions vesting ownership in the federal government ... clearly constitutes a federal policy that cannot tolerate the concomitant operation of the state's bailment lien foreclo-

sure." 882 F.2d at 1162 (citing *Boyle v. United Technologies,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)).

In arguing that plaintiff has, indeed, properly stated a claim for relief under the Fifth Amendment, plaintiff cites to *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554. In that case, the Supreme Court held, first, that certain state liens held by subcontractors to a government contract represented compensable property interests, for purposes of the Fifth Amendment; and second, that by extinguishing these lien interests, the United States committed a taking for which the subcontractors/lienholders were entitled to just compensation. 364 U.S. at 43, 48, 80 S.Ct. at 1565–66, 1568–69. Plaintiff's reliance on *Armstrong* in the context of the present case, however, is misplaced. Although the *Armstrong* Court did permit subcontractors/lienholders to assert Fifth Amendment claims for the government's taking of their security interests, the lienholders in *Armstrong,* unlike plaintiff in this case, acquired their security interests *before* the United States took title to the property at issue. 364 U.S. at 43–44, 80 S.Ct. at 1565–66. A closer analysis of *Armstrong* and its progeny reveals that this distinction is critical, and ultimately fatal to plaintiff's Fifth Amendment claim.

The dispute in *Armstrong* resulted from a contract between the United States and a prime contractor, a shipyard in the state of Maine, for the construction of several navy personnel boats. 364 U.S. at 41, 80 S.Ct. at 1564–65. When the prime contractor defaulted during the performance of the contract, the United States took title to the uncompleted hulls and all manufacturing materials then on hand, as provided for in the contract, and forwarded these materials to an out-of-state shipyard to complete construction. *Id.* At the time the United States took title to the uncompleted hulls, the petitioners in *Armstrong*—a group of subcontractors that had furnished numerous construction materials to the prime contractor—had not

yet been paid. *Id.* The subcontractors alleged that, by operation of Maine law,[7] they each possessed a lien interest in the unfinished hulls and in the materials that had been delivered to the out-of-state shipyard. *Id.* The subcontractors/lienholders eventually brought suit in our predecessor court, the United States Court of Claims, on the theory that the United States had taken their security interests in the hulls and materials. *Id.*

The Court of Claims, relying on the principle announced in *Ansonia Brass,* 218 U.S. 452, 31 S.Ct. 49, that state liens may not be asserted against the United States, dismissed the suit. *Armstrong,* 364 U.S. at 42, 80 S.Ct. at 1565. On appeal, the Supreme Court reversed, and held that the subcontractors did possess valid liens that were taken when the United States took title to the uncompleted hulls and materials. *Id.* at 43–44, 80 S.Ct. at 1565–66. In reaching this conclusion, the Supreme Court first noted that "the terms of the contract between [the prime contractor] and the United States show conclusively that [the prime contractor], not the United States, had title to the property when petitioners [the subcontractors/lienholders] furnished their materials." *Id.* at 43, 80 S.Ct. at 1566. Thus, the court concluded that "[i]n their totality, [the contract] provisions clearly recognize that title was to remain in [the prime contractor] during performance of the work, and show that *private liens could attach to the property while the [prime contractor] owned it.*" *Id.* at 44, 80 S.Ct. at 1566 (emphasis added).

Clearly, the subcontractors' liens in *Armstrong* were only enforceable because those liens arose *before the United States took title to the property,* that is, while title rested with the prime contractor. *Id.; see also Aetna Casualty & Surety Co.,* 655 F.2d at 1059, n. 18 (holding that in cases involving a taking of a security interest, the "critical inquiry" is whether the liens were enforceable at the time the government took title to the property); *compare United States v. Lindberg*

---

7. The lien in *Armstrong* arose under a Maine statute that provided that " '[w]hoever furnishes labor or materials for building a vessel has a lien on it therefor, which may be enforced by attachment thereof within 4 days after it is launched

... He also has a lien on the materials furnished before they become part of the vessel, which may be enforced by attachment ...' " 364 U.S. at 41, 80 S.Ct. at 1565 (quoting Maine Rev. Stat., 1954, c. 178, § 13).

*Corp.*, 882 F.2d at 1162 (holding that a lien on federal government property acquired subsequent to the time that title vests in the United States is unenforceable). The decision in *Armstrong*, therefore, did not undermine the long-standing principle that private liens may not be asserted against property owned by the United States. *Armstrong*, 364 U.S. at 42, 80 S.Ct. at 1565. Indeed, the very reason that the government was deemed to have taken the subcontractors' liens in *Armstrong* was the fact that the subcontractors' state liens could not be enforced against property once title had been transferred to the United States; as the *Armstrong* Court stated, "[a]fter transfer [of the hulls and materials] to the United States the liens ... could not be enforced because of the sovereign immunity of the Government and its property from suit." *Id.* at 46, 80 S.Ct. at 1567; *see also J.F. Hodgkins Co. v. United States*, 162 Ct.Cl. 40, 318 F.2d 932, 934 (1963) ("Because of the sovereign immunity of the United States, any lien owned prior to the execution of the transfer of title [to the United States] became unenforceable immediately thereafter, resulting in the constructive destruction of such lien....").

The present case differs from *Armstrong* and its progeny in that plaintiff does not claim that a lien was created in favor of plaintiff before title vested in the United States, *e.g.*, while title to the computer system was held by the prime contractor. Instead, plaintiff claims that, under Maryland state law, plaintiff reserved a security interest in the computer at the same time that plaintiff delivered the computer to the NSA along with the delivery ticket. Plaintiff's contention conflicts with the terms of the prime contract, however, which specifically provided that title to the computer vested in the government at the time of delivery. *See* FAR 52.245–5(c)(2). Plaintiff's contention also conflicts with the overwhelming weight of authority that state liens cannot be asserted against property of the United States. Thus, plaintiff has failed to demonstrate a legally cognizable property interest for purposes of pursuing a Fifth Amendment claim.

## CONCLUSION

For the foregoing reasons, the court concludes that plaintiff has failed to state a claim upon which relief can be granted for either a breach of an implied-in-fact contract, or a Fifth Amendment taking. Accordingly, defendant's motion to dismiss is granted. The clerk will dismiss the complaint. No costs.