*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

In re:  DWIGHT NICHOLS and PEGGY NICHOLS,
                                            *Debtors.*

————————————————————————

AMERICREDIT FINANCIAL SERVICES, INC.,
                                      *Creditor-Appellant,*

         *v.*

DWIGHT NICHOLS and PEGGY NICHOLS,
                                      *Debtors-Appellees.*

> No. 04-2107

————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 04-70836; 04-70785 —Arthur J. Tarnow, District Judge.

Argued:  November 9, 2005

Decided and Filed:  March 16, 2006

Before:  MERRITT, MOORE, and SUTTON, Circuit Judges.

————————

## COUNSEL

**ARGUED:**  S. Thomas Padgett, DeBRINCAT & PADGETT, Farmington Hills, Michigan, for Appellant.   Charles J. Schneider, CHARLES J. SCHNEIDER P.C., Livonia, Michigan, for Appellees.  **ON BRIEF:**  S. Thomas Padgett, DeBRINCAT & PADGETT, Farmington Hills, Michigan, for Appellant.   Charles J. Schneider, CHARLES J. SCHNEIDER P.C., Livonia, Michigan, for Appellees.

————————

## OPINION

————————

        MERRITT, Circuit Judge.  The instant appeal raises a problem that arises frequently in bankruptcy proceedings. The question before us is whether the Court should permit the modification of a Chapter 13 plan after confirmation pursuant to § 1329 of the Bankruptcy Code, or instead allow the secured creditor to repossess its security, a 1995 Ford truck, because under the modified plan the value of the security will fall faster than the creditor receives payments.  In resolving this dispute, we look to the procedure outlined in our Court's previous case of *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir. 1982)(dividing a secured claim in Chapter 13 proceedings into the

1

"allowed secured claim" and "allowed unsecured claim" and requiring the payment in Chapter 13 of the "allowed secured claim" and a reasonable interest rate on that amount as the "allowed unsecured claim").  As discussed below, applying the procedure and standard set out in *Memphis Bank*, we affirm the decision of the courts below denying the motion to lift the stay and permitting the modification of the Chapter 13 plan.

## I.  Background

The payment schedule under the modification in the instant case does not seem to require the rate of payment by the debtor to keep pace with the depreciation of the truck, thereby allowing the value of the "retained lien" in the truck to fall below the amount owed by the Chapter 13 debtors. Section 1329 provides in relevant part:

### §1329. Modification of Plan After Confirmation

(a)  At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to–

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments; or

(3) alter the amount of the distribution to a creditor . . . .

(b)       (1) Sections 1322(a), 1322(b), and 1323(c) . . . and the requirements of section 1325(a) . . . apply to any modification under subsection (a) of this section.

In turn, § 1325(a)[1]  – using general language – limits the circumstances under which a modification may be approved by the bankruptcy court to situations in which the secured creditor is allowed "to retain the lien securing such a claim."  Judge Keith Lundin in his treatise on Chapter 13 bankruptcy cases explains in a general way how these provisions must be interpreted to insure the value of the secured creditor's "retained lien:"

---

[1]The version of § 1325 in effect at the time debtors filed their Chapter 13 petition is as follows:

(a) The court shall confirm a plan if--

. . .

(4) the value, as of the effective date of the plan, of property to be distributed under the plan of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
(5) with respect to each allowed secured claim provided for by the plan--
(A) the holder of such claim has accepted the plan;
(B)(i) *the plan provides that the holder of such claim retain the lien securing such claim*; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.

(Emphasis added.)

Lien retention in § 1325(a)(5)(B)(i) has been interpreted to require that payments through the plan must at least equal depreciation in the value of collateral during the repayment period. Not to be confused with adequate protection before confirmation or with the payment of present value (interest) after confirmation, lien retention *avoids constitutional problems only if periodic payments under the plan equal or exceed the value lost through depreciation and use of collateral by the debtor after confirmation*. Put another way, even if the plan recites that secured claim holders retain liens, if the payments proposed by the plan are insufficient to stay ahead of depreciation, the retained liens will erode faster than the allowed secured claim is paid, contrary to the intent of §1325(a)(5)(B)(i).

. . .

*The power to modify a secured claim is limited to the extent that the debtor must propose payments that equal or exceed the depreciation in value of the collateral that secures the claim.* Otherwise, the delay in payments through the plan would take value from the lien without compensating the creditors for its loss.

[L]ien retention is implicated when the order of payments to creditors under the plan delays or interrupts the payment of a secured claim such that the value of the collateral falls more quickly than the lienholder receives payments.

Keith Lundin, *Chapter 13 Bankruptcy* 104-4 to 104-5 (3d ed. 2000) (emphasis added).

The Supreme Court has recognized, as did the common law, that the secured creditor has two types of rights:  the *contractual* right to obtain repayment of its debt with a fair rate of return in the form of interest payments and the *property right* the creditor has in the collateral that secures the debt.  These two types of rights together constitute the "bundle of rights" held by the secured creditor.  Bankruptcy laws have long been construed to authorize the impairment of contractual obligations. *United States v. Security Indus. Bank*, 459 U.S. 70, 74 (1982) (citing *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902)).  The power of the bankruptcy laws, however, is subject to the Fifth Amendment's prohibition against taking property without just compensation.  This distinction creates the also long-recognized tension between permitting the impairment of contractual obligations while maintaining the integrity of the property rights. *Security Indus. Bank*, 459 U.S. at 75 (citing *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935)).

Courts constantly struggle with this balance in bankruptcy proceedings.  For example, in *Armstrong v. United States*, 364 U.S. 40 (1960), subcontractors delivered material to the prime contractor for use in constructing Navy vessels, obtaining liens in the vessels as required by state law.  The prime contractor defaulted on its obligation to the Navy and the United States took possession of the uncompleted hulls and unused materials, making it impossible for the subcontractors to enforce their secured interest in the property in the form of liens.  The Supreme Court held this action constituted a taking due to the "total destruction" by the United States of all value in the liens.  The Court found the liens to be compensable personal property susceptible to a taking and not a "mere consequential incidence" of a valid regulatory measure.[2] *Id.* at 48.  While the bankruptcy laws allow interference with contractual arrangements and some diminution of property rights, if the interference goes so far as to constitute "total destruction" of the value in the property held by a creditor, it violates the Fifth Amendment and may not stand.

---

[2]A takings analysis is not limited to outright acquisitions of property by the government, but may include transfers of property from one nongovernmental entity to another due to government laws or regulations. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980).

We note that in the instant case, Americredit has not directly made a Fifth Amendment takings argument. Because Americredit clearly has a property interest in the collateral, we must decide whether the modification to the plan so interferes with its economic rights in that property to result in an unconstitutional taking. We do not find such a harm because the modified plan approved by the bankruptcy court leaves Americredit in the position for which it bargained: a fixed amount for a fixed period. The only difference is the delay before Americredit will receive its final payment, and, under the circumstances here, we do not find that the delay unduly impairs the value of its lien or encroaches on its Fifth Amendment rights.

## II. Motion to Lift the Automatic Stay

In this case, the debtors, Dwight and Peggy Nichols, purchased a used 1995 Ford truck in 1997 for $15,000, putting down $1,000 and taking out an installment loan of $14,000 from lender Americredit. As a term of the loan, Americredit had a first lien and security interest in the truck. The loan, with 22% interest, was to be paid back in monthly installments of $385 over five years, totalling $23,100. On June 8, 2001, debtors filed for bankruptcy under Chapter 13. Although the record is not clear on exactly how much had been paid on the installment loan at the time of the bankruptcy filing, debtors had made monthly payments for about 36 or 37 months totaling approximately $14,300.

A Chapter 13 plan was approved in August 2001 whereby Americredit became one of several secured creditors. The plan called for the debtors, over a five-year period, to pay the trustee, not Americredit, a certain amount each week and the trustee would then distribute the money to creditors based upon priorities set out in the plan. At the time of confirmation of the original plan in August 2001, Americredit agreed to a value on the truck of $7,000 and a lien amount of $5,700, leaving debtors with $1,300 in equity in the truck at that time. Under the original Chapter 13 Plan as approved by the bankruptcy court, the remainder of the truck loan would have been repaid over the five-year term of the plan.[3]

Dwight Nichols lost his job in 2003 and the debtors ceased making the required payments to the trustee in full as required under the plan. The Nichols missed payments to the trustee between August 17, 2003, and January 13, 2004. As a result, the trustee did not make regular payments to the creditors during this time, including Americredit. In response, Americredit filed, in December 2003 after about four months of missed payments, a Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362,[4] with the intent to repossess the truck if the stay was lifted.

---

[3] Although the original Chapter 13 Plan called for the repayment of the truck loan in full over five years at an agreed upon amount and interest rate, it did not guarantee Americredit a certain amount each month.

[4] The relevant portion of the statute provides:
. . .

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]

(2) with respect to a stay of an act against property under subsection (a) of this section, if --

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization . . . .

11 U.S.C. § 362(d).

In order to lift the stay and repossess the truck, it is Americredit's burden to demonstrate that the value of the collateral has fallen below the amount owed. 11 U.S.C. § 362(g). As far as we can tell from the record, Americredit has failed to establish that at the time of its motion to lift the stay, or even at the time of the plan modification shortly thereafter, that the value of the truck had fallen below what was owed. Although the bankruptcy court did not make clear findings on the value of the truck or the amount still owed or the number and amount of missed payments, the parties agree that the value of the truck, according to the National Automobile Dealers Association, was $4,800 at the time of filing the motion to lift the stay.[5] In addition, Americredit stated in its Motion for Relief from the Stay that the amount in arrears is $4,607.88. Based on Americredit's own numbers, the equity in the truck at the time of the filing of the Motion for Relief from the Stay was $192.12. Therefore, the record indicates that while Americredit was close to being undersecured when it filed its motion to lift the stay, a small "equity cushion" still existed. An equity cushion exists when the appraised value of the collateral is greater than the amount owed on the loan. A lender seeks to lend on an equity cushion, among other reasons, in order to hedge against the depreciation in the value of the collateral. It was undoubtedly close, but it is undisputed that the debtors still had equity in the truck so that relief under section 362(d)(2) was not warranted.

In addition to a lack of equity, creditors may also seek to lift the stay "for cause." 11 U.S.C. § 362(d)(1). Americredit's primary argument supporting its motion to lift the stay for cause was that the value of the truck had fallen, or would soon fall, below the amount owed on the loan. A majority of courts that have construed the "for cause" provision of section 362(d)(1) have found that a debtor's failure to make payments to the creditor after confirmation of the plan can constitute cause to modify or lift an automatic stay. The failure to make payments, standing alone, however, does not usually constitute "cause" to modify or lift the stay, especially where failure to pay resulted from circumstances beyond the debtor's control, such as illness or job loss. When there is still equity in the collateral, courts are not inclined to lift the stay. *In re Mathews*, 208 B.R. 506, 511 n.6 (Bankr. N.D. Ala. 1997) (listing cases holding that where there was equity in the collateral, the stay was not lifted or modified, despite missed payments after confirmation); *In re Raymond*, 99 B.R. 819, 822 (Bankr. S.D. Ohio 1989). Generally, before modifying or lifting a stay, a court should first weigh the equities by conducting a fact-specific analysis of the circumstances surrounding the default. *In re Mendoza*, 111 F.3d 1264, 1271 (5th Cir. 1997) (citations omitted).

After a hearing before the bankruptcy judge on the Motion for Relief from the Automatic Stay, the bankruptcy court ordered that the stay would be lifted unless the Nichols either (1) paid the amount in arrears within two weeks of the hearing or (2) filed a motion to modify its Chapter 13 plan to explain how it planned to pay what it owed to Americredit and the other creditors. *See* Transcript of hearing held January 7, 2004. Under the circumstances, we find no abuse of discretion in the bankruptcy court's decision to deny the motion to lift the stay and allow debtors to file a proposed modification of the plan.

### III. Modification of the Plan

The debtors chose to modify the plan pursuant to 11 U.S.C. § 1329. As stated above, section 1329(a) provides that prior to completion of payments under the plan, the debtor may request a modification of the plan to increase or decrease the amount of payments or extend or reduce the time for payments. Modification of the plan is one way a debtor may cure a post-confirmation default, provided that the plan, as modified, conforms with the requirements of §§ 1322(a) and (b) (contents of plan), and § 1325(a) (requirements for confirmation of plan). 11 U.S.C. § 1329(b); *In re Hoggle*,

---

[5]The parties are bound by the terms of the confirmed plan, including the values assigned to collateral and the amount of payment to be received. 11 U.S.C. § 1327; *In re Wellman*, 322 B.R. 298, 301 (6th Cir. BAP 2004). Therefore, a creditor cannot come in after confirmation and argue that the value assigned to collateral was mistaken or unfair.

12 F.3d 1008 (11th Cir. 1994); *In re Davis*, 110 B.R. 834 (Bankr. W.D. Tenn. 1989); *but see In re Nicholson*, 70 B.R. 398 (Bankr. D. Colo. 1987) (disallowing modification to cure arrearages).

A new "modified" Chapter 13 plan was drawn up whereby debtors would increase the weekly payments to the trustee, but, in accordance with the class priorities set out in the original plan, the arrearage on the debtors' home mortgage was to be paid up before the other secured creditors in lower classes, such as Americredit, would get any further payments. Americredit objected to this modified plan, arguing that it would not receive payments on the truck for approximately a year and during that time the value of the truck would fall below the amount owed, thereby prejudicing its lien rights in violation of 11 U.S.C. § 1325.

The bankruptcy court held a hearing concerning Americredit's objections to the modified Chapter 13 Plan. *See* Transcript of hearing held Feb. 18, 2004. Americredit stated at the hearing held on the plan modification on February 18, 2004, that the plan modification "severely prejudices the collateral [the truck]" in violation of its lien rights under 11 U.S.C. § 1325(a)(5)(B)(i), which requires, as stated above, that for each secured claim under the plan, "the plan provides that the holder of such claim retain the lien securing such claim . . . ." The bankruptcy court overruled Americredit's objections to the plan modification, ruling, among other things, that the lack of "adequate protection" for the truck was not sufficient reason to deny modification of the plan and, moreover, the evidence did not demonstrate that the value of the truck had fallen below the amount owed.

Americredit appealed the denial of its Motion to Lift the Automatic Stay and the Order Modifying Chapter 13 Plan to the district court, which held a hearing on July 15, 2004. The district court issued a one-page order affirming the bankruptcy court and did not issue written findings of fact and conclusions of law. We sympathize with the district court's stated frustration during the hearing: "[the parties] have not presented me with the clearest record in terms of exhibits, and the Bankruptcy Court has used different figures. But I am prepared to rule based on the figures that you just gave me, which I think are in the record. . . . I'm not finding whether the Bankruptcy Judge was right or wrong. I'm finding the Bankruptcy Judge did not abuse his discretion [in denying the Motion for Relief from the Stay and approving the Plan modification] and on the record as presented in this case." *See* Transcript of July 15, 2004, hearing at 75.

## IV. Analysis

Although often left unstated in bankruptcy cases, the concept behind the treatment of secured claims like Americredit's is fairly simple. The total allowed claim of the secured creditor is divided into two parts: the "allowed secured claim" and the "allowed unsecured claim." 11 U.S.C. §1325.[6]

---

[6]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, was enacted on April 20, 2005. It is the first wholesale modification of bankruptcy law since the Bankruptcy Reform Act of 1978. The 2005 Act is "effective, except as otherwise provided, 180 days after April 20, 2005 [*i.e.,* on or after October 17, 2005], and inapplicable with respect to cases commenced under Title 11 before the effective date." Pub. L. No. 109-8, § 1501. The 2005 Act, therefore, while instructive, is not applicable to the case before us because this bankruptcy proceeding commenced in 2001 and the Motion to Lift the Stay was filed in 2003, both dates occurring well before the Act's effective date of October 17, 2005.

The language in amended section 1325(a) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, however, which addresses the components necessary to confirm a plan, reinforces the importance of maintaining the creditor's lien rights. Unlike the previous section 1325, the new language seems to require that payments made after confirmation be in equal amounts and keep pace with depreciation during the term of the plan. 11 U.S.C. § 1325(a)(5)(B)(iii). The amended section states that a court shall confirm the plan if with respect to each allowed secured claim provide by the plan:
     . . .

In order to clarify this distinction, a procedure was set out by this Court almost 25 years ago for handling a secured claim in a Chapter 13 plan. *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 430-31 (6th Cir. 1982). In *Memphis Bank* we held that section 1325(a)(5) requires the bankruptcy court to assess interest on an allowed secured claim for the present value of the collateral in order to avoid dilution of the value of the claim through the delay in payment. As we explained:

> The concept behind the treatment of secured claims under the [then-]new Chapter 13 is fairly simple. The total claim of the secured creditor which is to be allowed is divided into two parts, the secured portion of the claim and the unsecured portion. These two are called in section 1325 the "allowed secured claim" and the "allowed unsecured claim." The secured portion of the total claim represents the present value of the collateral and the unsecured portion is the remainder, i.e., the amount the allowed claim exceeds the value of the collateral.

*Memphis Bank*, 692 F.2d at 429.

The advantage to the creditor of this approach is that it knows the plan will require the debtor to repay the debt to the extent of the value of the security. But we also held in *Memphis Bank* that if this amount will not be paid immediately, interest should be assessed on the amount which the debtor will repay to compensate the creditor for the use of its money. We recognized in *Memphis Bank* that under section 1325, the creditor is required, in effect, "to make a new loan in the amount of the value of the collateral rather than repossess it, [but] the creditor is entitled to interest on his loan." *Id.; see also United States v. Arnold*, 878 F.2d 925, 928 (6th Cir. 1989).

The procedure in *Memphis Bank* should be applied in the original plan as well as any later modifications to the plan, which includes the case before us.[7] The steps are as follows:

> 1. Determine the present value of the collateral under the secured claim provisions of § 1325.
>
> 2. Determine the amount allowable under applicable law to the creditor by virtue of the debtor's default, including unpaid principal, finance charges, interest earned prior to filing but unpaid, etc.
>
> 3. Subtract the amount of the secured claim determined in Step 1 from the amount calculated in Step 2. This represents the unsecured claim.

---

> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
> (iii) if --
>   (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
>   (II) *the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide the holder of such claim adequate protection during the period of the plan* . . . .

11 U.S.C. § § 1325(a)(5)(B)(ii) and (iii)(I) and (II) (emphasis added). If these provisions, among others, are not met, the property must be surrendered to the creditor. *Id.* § 1325(a)(5)(C). *See also* House Rep. No. 109-31(Part I); 2005 U.S.C.C.A.N. 88.

[7] Although *Memphis Bank* is most often cited for its holding on determining the appropriate interest rate for claims under a plan, the process it set out for handling claims in Chapter 13 proceedings continues to be proper procedure in this Circuit.

4. Determine the appropriate interest rate to be applied to the secured claim.[8]  Add the secured claim and the interest to be paid.

5. Determine based on the debtor's ability to pay and his conduct how much of the "allowed unsecured claim" should be paid, provided this amount is not less than the value the creditor would receive in straight bankruptcy.

6. Determine whether the debtor's proposed plan, based on his ability to pay and conduct, is reasonable and in good faith.

7. Confirm, deny confirmation or suggest modifications in the plan depending on the outcome of step 6.

*Memphis Bank*, 692 F.2d at 430-31.  The procedure fits well with the statutory framework and purpose in Chapter 13 cases and continues to be the law in this Circuit.

The parties agree that the value of the truck, according to the National Automobile Dealers Association, was $4,800 at the time of filing the motion to lift the stay.  Because we have not found any numbers in the record that change the value of the truck between the time of the motion to lift the stay and confirmation of the modified plan, we will use that number in looking at the modified plan.  In addition, Americredit states in its Motion for Relief from the Stay that the amount in arrears is $4,607.88.  Based on Americredit's own  numbers, the equity in the truck at the time of the filing of the Motion for Relief from the Stay and the plan modification was $192.12.  Using the steps set out above, we find that the secured portion of the total claims is the present value of the collateral at the time of the motion to lift the stay and modify the plan ($4,800) and the unsecured portion is the remainder – the amount that the allowed claim ($4,607.88) exceeds the value of the collateral.  Here, the "remainder" is zero – there was no unsecured portion of the claim at the time the plan was modified.  While the equity cushion is not large – $192.12 – Americredit, by its own admission, was not undersecured at the time of the modification.

The purpose of the bankruptcy laws is to give the debtor a fresh start while keeping the creditor as close to its original position as possible and this provides the guiding principle behind Chapter 13 reorganization of individual debtors.  As stated in *Memphis Bank*, the effect of Chapter 13 is to extend, in modified form, the lending relationship that creditor and debtor created by contract.  *Memphis Bank*, 692 F.2d at 429 ("In effect the law requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan.").  Section 1325(a)(5)(B)(ii) states that the bankruptcy court *shall* confirm a plan if "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." At the time of the modification, Americredit was 100% secured, albeit by a very small amount. Therefore, at the time, Americredit had retained the value of its lien and the bankruptcy court did not abuse its discretion in approving the modification.

The modified plan proposed to cure the delinquency by increasing the weekly payments to the trustee from $298 to $340.  Despite this increase in payments, Americredit argues that the failure

---

[8]*Memphis Bank* held that a secured creditor was entitled to receive interest on mortgage arrearages to be paid under the plan despite the absence of a specific clause in loan agreement providing for interest on mortgage arrearages. This so-called "coerced loan theory" was held improper in *Till v. SCS Credit Corp.,* 541 U.S. 465 (2004),  a plurality opinion.  In *Till*, a Chapter 13 case, the Supreme Court evaluated the four widely used methods of calculating the interest rate on a secured loan (the coerced loan, presumptive contract rate, formula rate, and cost of funds approaches) and found that all but the formula rate suffered from serious flaws.  The Court endorsed the use of the formula approach. *Id.* at 479.

to retain the lien stems from the fact that it would not receive any payments for almost a year because the modified plan provides for debtors to cure the arrearages in their home mortgage before commencing payments to Americredit. The plan, as modified, does not, according to Americredit, keep pace with the depreciation of the truck and the value of the collateral will fall faster than the creditor receives payment. Therefore, Americredit objected to the modification of the plan on the ground that the delay in payments will allow the value of the truck to fall below the amount owed, making Americredit an "undersecured" creditor that is not retaining its lien rights in the collateral in violation of § 1325.

Although no figures were found by the bankruptcy court, nor were any provided by Americredit, it is reasonable to assume that the value of the truck will fall, or depreciate, over the course of the year, likely bringing the present value of the truck below the amount owed sometime during the ensuing year. While we do not know how much depreciation to expect in the truck over the course of the year, the parties agreed to, and are bound by, a value of $4,800 at the time of the modification. Although Americredit may become slightly undersecured during the year, it is unlikely that the value will fall so far before Americredit begins to receive payments that the value of the lien would be compromised. The difference between the value of the truck and the amount owed will likely not rise to a significant level during the course of the year – certainly not enough to render the lien "totally destroyed" and of no value to Americredit. *See Penn Cent. Trans. Co. v. New York City*, 438 U.S. 104, 124-25 (1978) (government actions that cause economic harm cannot be considered takings when they do not "interfere with interests that are sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes.") Furthermore, Americredit's "reasonable expectations" – and what it bargained for in the original installment loan – was a stream of payments over time.[9] Given the small amount of any unsecured claim, we see no reason to disallow the modification in this instance.

Americredit's primary argument stems not from the lack of retention of its lien value, *per se*, but from the lack of a steady payment stream over the course of the year. A creditor with a lien on personal property has contracted for an uninterrupted stream of revenue at the agreed-upon rate, and it generally would prefer not to repossess the property to retain its lien – particularly on low-value, depreciating personal property like a 9-year-old truck. While the equity cushion is not large here, one does exist and we have been provided no evidence that the equity cushion, should it disappear, is so important at this point in the particular financial relationship as to require denial of the plan modification.

Although we would not condone multiple § 1329 modifications of a plan, one modification after three years of substantial compliance[10] and the possibility of a small undersecured claim for an uncertain period of time does not seem unreasonable. Furthermore, while not receiving everything it originally expected under the terms of the original installment loan, Americredit has received substantial payments over the years and there is no reason to expect that debtors will default again – they are gainfully employed again and have agreed to increase their weekly payments under the modified plan. Chapter 13 plans should be structured to ensure that whenever possible secured creditors receive payments that keep pace with the anticipated rate of depreciation on collateral so that the creditor does not become undersecured. However, a creditor has no guarantee that the collateral to which a lien attaches will have equity to pay the lien when and if the lien is liquidated. Furthermore, Americredit has always been on notice that remedial laws, such as the

---

[9]Certainly Americredit would have been free (and is still free) to file another motion to lift the stay and to demonstrate that the value of its lien has been destroyed or severely compromised since the modification.

[10]Here, debtors contend that they are in "substantial compliance" with the terms of the plan as demonstrated by their 85% payment history after confirmation and they also claim that because Dwight Nichols uses the truck to get to work, it is necessary for an effective reorganization.

Bankruptcy Code, exist. Americredit sets its interest rates high in response to such risks. The argument that Congress, through its bankruptcy powers, cannot enact any remedy that requires a secured creditor to bear any of the impact of a debtor's financial reorganization is inconsistent with the purposes of Chapters 7, 11 and 13. In a reorganization, the lender is not actually extending new monies to the debtor; rather, it is being delayed in the repayment of a previous loan.

Although not phrased this way, what Americredit seeks herein is to enforce its contract rights through the payment of the agreed-upon interest on the truck loan – which is perfectly legitimate for an installment loan situation where the property is paid for over time. However, we see no constitutional or statutory violation because the value of Americredit lien has not been destroyed – in fact, Americredit has received a significant portion of the total amount due and will receive most of what it bargained for at the start, including interest. Given that the amount now owed basically consists of interest payments on the original loan amount, the fact that the modified plan delays payments for a period of a year does not impair Americredit's lien rights, and it was not an abuse of discretion for the bankruptcy court to approve the modified plan. Accordingly, we affirm the judgment of the District Court.